UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Richmond Division)

| | | |
|---|---|---|
| CYNTHIA ADVANI MARSHALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *v.* | ) | Case # 3:20-cv-442 |
| | ) | |
| JOHN MARSHALL | ) | |
| 13500 Cotley Lane | ) | COMPLAINT |
| Henrico, VA 23233, | ) | |
| | ) | |
| ROBERT MARSHALL | ) | |
| 11704 Norwich Court | ) | |
| Glen Allen, VA 23059, | ) | |
| | ) | |
| BRENDA MARSHALL THOMPSON | ) | |
| 5201 Windsor Road, #B | ) | |
| Sandston, VA 23150, | ) | |
| | ) | |
| ANDREA MARSHALL VOEHRINGER | ) | |
| 1423 Ardleigh Circle | ) | |
| West Chester, PA 19380, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| T. W. HOLMES | ) | |
| Henrico County Police Department | ) | |
| 7721 East Parham Road | ) | |
| Richmond, VA 23294, | ) | |
| | ) | |
| Defendants. | ) | |

<u>Preliminary and Jurisdictional Statement</u>

1.  This is a lawsuit against private individuals abusing state law and acting in concert with state actors to deprive a citizen of her property without justification, probable cause, or due process of law.

2.  In 2014, Watson Melton Marshall, a descendent of Chief Justice John Marshall of the United States Supreme Court, divorced his first wife, a white woman, after 58 years of marriage. He then married Cynthia Advani Marshall ("Ms. Marshall"), an African-American woman.   Mr. Marshall's children –  defendants John Marshall, Robert Marshall, Brenda Thompson, and Andrea Voehringer ("the Marshall defendants")  –  were furious at the remarriage of their father to Ms. Marshall, and treated her with hostility and contempt.   In 2018, Mr. Marshall, then eighty years of age, became terminally ill.   At this time, the Marshall defendants embarked on a malicious campaign to sever Ms. Marshall completely from her husband and the Marshall family and legacy.   They conspired with an officer of the Henrico County Police Department who was keen to act in support of defendant John Marshall, a sitting Henrico County Circuit judge, to secure an improper *ex parte* emergency, four-day protective order driving Ms. Marshall from her own home wherein she had lived for 24 years, the last three with Mr. Marshall.   This took place at approximately 11 P.M., Ms. Marshall being rousted from her home on a few minutes' notice, wearing a nightgown.   Defendants applied for and secured the ouster of Ms. Marshall from her home in full knowledge that doing so exceeded all statutory grounds for such an order, given that its intended beneficiary was then secure in a hospital room and not expected to leave during at least the four days the order was to remain in force, and during which Ms. Marshall was barred from coming into contact with her husband by separate restrictions set forth in the order.

Promptly following Ms. Marshall's eviction from her home, the Marshall defendants conspired among themselves to take property, including some belonging to Ms. Marshall, from her own home, some of which has never been returned.  This case, responding to defendants' ill use of Ms. Marshall, arises under the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983. The court has jurisdiction over it pursuant to 28 U.S.C. §1331.  The case also presents state law claims of conversion, intentional infliction of emotional distress, and civil conspiracy, over which this court has supplemental jurisdiction under 28 U.S.C. §1367.

### Parties

3.  Plaintiff Cynthia Advani Marshall is a 60-year-old resident of Henrico, Virginia.  She is the widow of the late Watson Marshall.[1]  She is African-American.

4.  Defendants John Marshall, Robert Marshall, Brenda Marshall Thompson, and Andrea Marshall Voehringer are the adult children of Watson Marshall and his first wife, Annie Marshall.  Ms. Voehringer is a resident of Pennsylvania.  Her siblings live in Virginia.  They are white.

5.  Defendant T. W. Holmes was at all relevant times an officer with the Henrico County Police Department.

### Claim for Relief

6.  In 2015, Ms. Marshall was the sole owner of the house where she had lived for 21 years, located at 7603 Parkline Drive in Henrico.

---

[1]For ease of reference, in this complaint the late Watson Marshall will be referred to as Mr. Marshall, and his two sons by their full names, Robert Marshall and John Marshall.

7.  In 2015, Mr. Marshall, having divorced the mother of the Marshall defendants, married Ms. Marshall.  The two thereafter resided in Ms. Marshall's home.

8.  Following her marriage to Mr. Marshall, Ms. Marshall conveyed her home to herself and Mr. Marshall as tenants by the entirety.

9.  The Marshall defendants were deeply upset with their father for divorcing their mother and marrying Ms. Marshall.  Defendant John Marshall wrote to his father in April 2017: "[I]t was your decision to replace mom with Cynthia, not mine or my girls'.  You chose to become part of another family and have a different life.  I do not agree with these decisions and will not endorse them."  He wrote this on his letterhead as a judge of the Henrico Circuit Court, thereby adding gravitas to his objection.  Exhibit 1.[2]

10.  Out of loyalty to his wife, and faced with his children's relentless hostility towards her, Mr. Watson advised his children that he would not see them unless his wife was present. Agreeing to "abide by this rule," defendant John Marshall responded that as a result, "we would not be seeing you."  Exhibit 3.

11.  In response to his children's antipathy toward his wife, in May 2017, Mr. Marshall wrote to them:

---

[2]  While this iteration of the complaint does not allege racial animus on the part of all the defendants, Ms. Marshall gives notice of her intent to revisit the issue in light of forthcoming discovery.  In mid-2017, after verbally abusing Ms. Marshall as a "homewrecker," defendant Robert Marshall called her a "black bitch" to her face.  Following being sensitized by Ms. Marshall to the offensiveness of a Sambo statue in front of the Marshall estate where the Marshall defendants were raised and regularly visited their mother, Mr. Marshall asked his son John Marshall to remove it.  John Marshall declined to do so and the Sambo statute remains in place to date. *See* Exhibit 2.

> I have been talking to a counselor, who recommended that I
> contact my children and recommend that they seek counseling with
> regard to the problems you are having with my wife.  As you are
> aware, I am the one who left home and I know you are upset about
> it, but life goes on and Cynthia has taken good care of me.

Exhibit 4.[3]

12.   On information and belief, none of the Marshall defendants took their father's advice

and secured counseling. Their antipathy toward Ms. Marshall continued unabated.  In the period

prior to Mr. Marshall's June 2018 hospitalization, with a single exception, none of his children

ever visited him in his and Ms. Marshall's home.

13.   In the early spring of 2018, Mr. Marshall, then 80 years old, began losing his appetite

and stopped eating properly.  Ms. Marshall plied him with food that he said he liked and also

secured the assistance of neighbors to bring over food they cooked that Mr. Marshall particularly

favored.

14.   Ms. Marshall consulted with Mr. Marshall's primary physician regarding her

husband's refusal to eat.  The doctor prescribed medication to increase his appetite, which Ms.

Marshall picked up at a local pharmacy and administered to Mr. Watson.

15.   Despite Ms. Marshall's loving care and attention, Mr. Marshall increasingly declined

food and drink; he also experienced breathing difficulties.  In June 2018, Ms. Marshall

convinced her husband   – who had resisted hospital admission  –  to let her bring him to

Virginia

---

[3]Once Mr. Marshall retired from his active law practice in 2017, his letters continued to
be typed at his direction by his secretary of many years, who then mailed them following Mr.
Marshall's being driven to his office  – or thereafter the secretary's home  – by Ms. Marshall to
sign them.  Mr. Marshall retained unsigned copies of many final letters such as Exhibit 4.

Commonwealth University ("VCU") Hospital for treatment.  He was admitted on or about June 18 and remained hospitalized for several days before being discharged to his home.

16.  Ms. Marshall spent the nights of her husband's hospitalization sleeping on a chair in his room.

17.  Aware of his own frailty and of his wife's devotion to him, on June 29, 2018, Mr. Marshall filled out a Virginia Advance Directive for Health Care appointing Ms. Marshall as his agent to make health care decisions for him.

18.  In due course Mr. Watson was released from the hospital; however, his condition again deteriorated and on or about July 18, 2018, he was readmitted to VCU Hospital.

19.  Mr. Marshall was subject to bouts of irrationality during both his June and July hospitalizations. On several occasions, he demanded to be returned to his home and wife.  On one occasion when his wife was not present, he called the police by dialing 911on his hospital room phone.  Ms. Marshall was advised of this when returning to the hospital.  Knowing how to calm her husband, Ms. Marshall secured his agreement to remain in the hospital for treatment.

20.  Worried about her husband's precarious state, Ms. Marshall stayed with him in his hospital room during the day and spent the nights of July 18 and 20 in his room, sleeping on a chair.  It was too difficult for her to stay overnight on July 19 and she returned in the morning.

21.  With their father visibly failing, and with their hostility to Ms. Marshall unabated, some time prior to July 21, 2018, the Marshall defendants conspired to take actions to sever Ms. Marshall as fully as possible from their father and their family.

22.   On the morning of July 21, 2018, defendant Andrea Marshall Voehringer arrived at VCU Hospital and suggested to Ms. Marshall, who had spent the night sleeping on a chair in her husband's room, that she go home to shower and take a break from her hospital duty.

23.   Ms. Marshall took Ms. Voehringer's recommendation at face value, unaware that it was a ploy to remove her from her husband's side in aid of the Marshall defendants' conspiracy to sever her from their father and their family.

24.   Following the departure of Ms. Marshall on the morning of July 21, 2018, the Marshall defendants had a long-time family lawyer come promptly to Mr. Marshall's hospital room.  At the children's urging, and on information and belief with their payment or guarantee of payment, the lawyer on that day wrote up various documents replacing documents earlier created at the request of Mr. Marshall, including:

* A new advance medical directive naming John and Robert Marshall as Mr. Marshall's agents, and providing that they could "make decisions regarding visitation during any time that [Mr. Marshall was] admitted to any health care facility."

* A new general durable power of attorney specifically revoking the powers of attorney previously granted to Ms. Marshall and granting general power of attorney "as broad as possible" to John and Robert Marshall.

25.   Later on the same day, an enfeebled Mr. Marshall – he died August 8, 2018 – unable to write properly, affixed his mark  –  by no means his ordinary signature – to the above documents handed to him to sign.

26.   On July 23, 2018, the same Marshall family lawyer filed a complaint in Henrico County Circuit Court, where defendant John Marshall was a sitting judge, seeking a divorce for Mr. Marshall.   Mr. Marshall's signature or mark does not appear on the complaint for divorce filed in his name, and three days later, he was described by defendants Robert Marshall and Officer Holmes as being "in hospital/hospice care" and "incapable of filing a petition on his own behalf."[4]

27.   The Marshall defendants took no steps to have their counsel prosecute any aspect of the divorce case.  That case remained a dead letter, except to the extent that filings made therein by Marshall family counsel were then used by the Marshall defendants, acting without counsel, in aid of their collateral efforts to separate Ms. Marshall from her husband and his family, as set forth in ¶¶ 35-57.

28.   Using their new power of attorney secured from Mr. Marshall in his hospital bed, the Marshall defendants directed that Ms. Marshall be denied access to her husband.  This information was relayed telephonically to Ms. Marshall by a doctor acting at the direction of the Marshall defendants.  Ms. Marshall was appalled and traumatized by this news.

29.   Ms. Marshall did not believe that she could be barred from seeing her husband other than by court order or formal no-trespass notice, neither of which she had received.   She did not believe that she could be barred from seeing her husband because his children did not approve. After anguishing over what she should do, on July 25, 2018, she went to visit him.   She brought her marriage certificate with her, intended to demonstrate to hospital staff that she was obviously entitled to see her husband.

---

[4]See ¶¶36-38, *infra*.

30.   During the brief time that Ms. Marshall was alone with Mr. Marshall, he told her that he missed her and asked where she had been.  A hospital housekeeper told her that Mr. Marshall had repeatedly asked to see his wife.

31.   On the occasion of Ms. Marshall's July 25 visit, defendant Brenda Marshall Thompson entered Mr. Marshall's room and saw Ms. Marshall with her husband.  Ms. Thompson told Ms. Marshall that she was "not supposed to be there," following which Ms. Marshall was told to leave by a nurse.  The same nurse had on other occasions complimented Ms. Marshall on how devotedly she had cared for her hospitalized husband.

32.   The Marshall defendants called hospital security, who promptly arrived and informed Ms. Marshall that she was not on their list of permitted visitors and had to leave. Having registered her offense at being ordered away from her husband, Ms. Marshall left. Before leaving the hospital, she was told by hospital security personnel that were she to return, she would be trespassing.

33.   Ms. Marshall understood that given Mr. Marshall's new power of attorney to his sons, the hospital was within its legal (not moral) right to keep her from visiting her husband. Never having knowingly acted unlawfully, Ms. Marshall had no thought of violating the hospital's no-trespass order.  Nor did she propose to risk arrest, something she believed the Marshall defendants would not hesitate to procure were she to give them the opportunity by again attempting to visit her husband in the hospital.  She felt anguished, confused, and helpless, unable as a practical matter to offer a challenge to the actions of the prominent Marshall family.

34.   Ms. Marshall's July 25 visit was the last time she saw her husband alive.  He died on August 8, 2018.

35.   Sometime before the evening of July 26, 2016, the Marshall defendants undertook to seek an emergency protective order authorized by *Va. Code Ann.* §16.1-253.4, not simply to secure their father's court-ordered isolation from his wife, but to drive Ms. Marshall from her own home for four days, during which they might enter the house and take what they saw fit.

36.   Because an emergency protective order issues without prior notice to the respondent, the statute requires that the applicant be either the alleged victim of abuse or a law-enforcement officer.  The Marshall defendants did not, however, have their father make, or even put his mark on, a sworn statement in support of an emergency protective order.

37.   Given the lack of a supporting statement from Mr. Watson, the Marshall defendants secured the assistance of an officer with the Henrico County Police Department, defendant T. W. Holmes, to obtain the emergency protective order for them. Officer Holmes agreed to do so.

38.   Only three days earlier, the Marshall defendants had represented that Mr. Marshall was competent to file a complaint for divorce from his wife.  Now, however, in connection with the petition for an emergency protective order they sought, Robert Marshall and Officer Holmes certified that Mr. Marshall, "in hospital/hospice care," was "physically or mentally incapable of filing a petition pursuant to *Va. Code Ann.* §16.1.253.1."  Exhibit 5. This was a fair characterization, as Mr. Marshall had been disoriented ever since being admitted to the hospital on July 18, 2018.

39.   On information and belief, at the time defendants Robert Marshall and Officer Holmes applied for a protective order, Mr. Marshall's mental and physical condition was not materially changed from three days earlier when he allegedly approved the filing of a complaint for divorce.

-10-

40.  Robert Marshall prepared and signed a criminal complaint and an affidavit alleging that Ms. Marshall posed a threat to Mr. Marshall's well-being, for which reason the court should order her to "have no contact of any kind" with Mr. Marshall, nor be in his "physical presence." Officer Holmes filled out a supplementary criminal complaint against Ms. Marshall based on Robert Marshall's affidavit.

41.  Shortly after 10 P.M. on July 26, 2018, defendants Robert Marshall and Officer Holmes appeared before Magistrate S. Munoz of the Henrico Juvenile and Domestic Relations Court to seek an emergency protective order.

42.  On information and belief, it was highly unusual for such an application to be made and immediately granted after 10 P.M., in circumstances where there was no apparent immediate threat to the person intended to be protected by the order.  On information and belief, to secure their order, defendants traded on the fact that one of the persons supporting the proposed order was a Henrico Circuit Court judge.

43.  Having done nothing to advance the divorce case, which remained a dead letter, the Marshall defendants undertook to use the divorce complaint and motion for *pendente lite* relief filed in circuit court as exhibits to their *ex parte* motion for protective order from the Henrico Juvenile and Domestic Relations ("JDR")  court.

44.  At the time defendants Robert Marshall and Officer Holmes presented their affidavits  and complaint to the JDR magistrate, they were aware that there was then pending before the Henrico County Circuit Court a motion, filed by Marshall family counsel in the divorce case, requesting all the relief they could reasonably request and secure from any court on an emergency basis, including:

    \*      An order "preventing either spouse from imposing a restraint on the personal liberty of the other spouse,"

    \*      An order that Ms. Marshall "allow the Plaintiff or his agent to retrieve all of Plaintiff's personal property from the residence located at 7603 Parkline Drive, Henrico...," and

    \*      An order providing for the "protection of the plaintiff from the defendant."

45.   The Marshall defendants and their counsel could have given, and knew they could have given, immediate notice of the divorce complaint and motion for emergency relief to Ms. Marshall and obtained an emergency hearing to adjudicate their motion for *pendente lite* relief in Henrico County Circuit Court.   They did not do so, however, and instead proceeded with their *ex parte* motion for protective order, which was thus adjudicated without Ms. Marshall's having had an opportunity to contest the moving papers in any court at all.

46.   Knowing that Mr. Marshall was expected to remain in his VCU Hospital bed for at least the duration of their proposed emergency protective order; knowing that during this period, not to say for a considerably longer period of time, there was no chance that he might return to the home he shared with his wife (he died two weeks later); knowing that the magistrate could, as he then did, issue a form order directing Ms. Marshall "to have no contact of any kind" with Mr. Marshall, nor be in his "physical presence"; knowing that there was pending in circuit court a motion for yet another order to ensure Mr. Marshall's safety; and knowing that Ms. Marshall was 59 years of age – knowing all these things, in addition to procuring an *ex parte* order keeping Ms. Marshall from her husband, defendants Robert Marshall and Officer Holmes, acting pursuant to their conspiracy with the other Marshall defendants, also solicited and received an *ex*

-12-

*parte* order driving Ms. Marshall from her own home during the four-day pendency of the emergency protective order.

47.   Prior to presenting their emergency petition, defendants Robert Marshall and Officer Holmes did not consult with the Marshall family lawyer who a few days earlier had, at the request of the Marshall defendants, drafted the complaint for divorce and revised medical directive and power of attorney referenced above.  The lawyer remained ignorant of the petition until after it had been executed and Ms. Marshall rousted from her home.

48.   On information and belief, the reason for which defendants made a point of not consulting with the Marshall family counsel before securing an emergency order to evict Ms. Marshall from her home was because they believed, correctly, that he would not support such expulsion, given that Mr. Marshall was not at home and not scheduled to return during the pendency of the order, thus rendering the expulsion manifestly inappropriate given the purpose of such orders. The defendants were also aware that counsel might be troubled at the  conflict between the claim that Mr. Marshall, who had allegedly been competent to approve and sign numerous significant legal documents as recently as three days earlier, was now unable to fill out or even place his mark on a petition for a protective order.  They were further aware that their motion for *pendente lite* relief, sought by counsel, was pending and available for an emergency hearing if requested, and that it could provide sufficient guarantees of Mr. Marshall's well-being.

49.   The Marshall defendants' solicitation of the *ex parte* order to expel Ms. Marshall from her home was gratuitous, malicious, not based on probable cause, and not in service of any legitimate protective purpose.  To the contrary, it was procured to punish Ms. Marshall for having had the gall to marry their father, to create and put in the public record a permanent

document memorializing and publicizing her severance from her husband and all aspects of Marshall family life, and, as well, to secure free access to her home so as to seize property there.

50.   Robert Marshall submitted his affidavit in support of an order intended to evict Ms. Marshall from her own home in bad faith, knowing that under other terms of that very order, which he requested and received, she would be barred from coming into contact with her husband.  He knew that there was no purpose to be served in securing such a gratuitous eviction. He also knew that there was pending before the circuit court a motion, of which Ms. Marshall could be given notice and an opportunity to be heard, to ensure Mr. Marshall's well-being. Robert Marshall's bad faith facilitated the magistrate's erroneous approval of that portion of the magistrate's order providing for her eviction from her own home.

51.   At the time Officer Holmes applied for an order evicting Ms. Marshall from her own home for several days even as she was otherwise barred from coming into contact with her husband, he knew or should have known that under settled law governing the sanctity of the home, there was no probable cause or other plausible basis for such an eviction to be sought or accomplished.  Officer Holmes' reckless disregard of settled law facilitated the magistrate's erroneous approval of that portion of the magistrate's order providing for Ms. Marshall's eviction from her own home.

52.   The Marshall defendants contrived to have Ms. Marshall evicted from her own home notwithstanding that the order they sought and received countermanded the *pendente lite* relief they had earlier, by counsel, requested from circuit court, *i.e.,* an order "preventing either spouse from imposing a restraint on the personal liberty of the other spouse."

53.  The magistrate's order at issue issued on July 26, 2018 at 10:13 P.M. and expired on July 30, 2018 at 11:59 P.M.  Exhibit 5.[5]

54.  At approximately 11:15 P.M. on July 26, 2018, defendant Officer Holmes and two other male Henrico County officers came to Ms. Marshall's door, armed with the protective order Robert Marshall and Officer Holmes had just obtained.  Ms. Marshall was in her nightgown, preparing to go to bed.   She had no idea what was going on.

55.  There were no grounds whatsoever, other than malice, for a protective order to be served at 11:15 P.M. on an older woman going to bed if not already asleep, rather than in the morning.  On information and belief, defendants conspired to have Ms. Marshall evicted from her home as promptly as possible regardless of the time, inconvenience, and consequences, purely as a matter of malice.

56.  Officer Holmes told her that she had "five to eight minutes" to leave her home, not to return until midnight, July 30-31, 2018. This harsh direction was gratuitous, malicious, and without cause.

57.  Ms. Marshall, in shock and anguish, was in no position to argue or resist.  She had no history of doing anything but cooperating with law enforcement officers.  Having been told that she had to leave her house within five to eight minutes, she asked for leave to change into street clothes.  A male officer followed her into her bedroom and said that he would have to remain present as she changed.  She refused to change under these circumstances and remained in her

---

[5] *Va. Code Ann.* §16.1-253.4(C) provides that an emergency protective order is valid for three days unless it expires at a time when the court is not in session, in which case the order remains in effect until 11:59 P.M. on the next day the court is in session.  Three days from the time the order was obtained fell on a Sunday, so the order expired the night of Monday, July 30, 2018.

nightgown.  She put on the first footwear she could lay her hands on, not having time to locate the orthopedic sandals she wore to ease her feet.  She was not given sufficient time to collect all her various medications, and in her distress and confusion neglected to take a toothbrush.  She bundled some clothes together, walked to her car, and drove away, not to return until the morning of July 31, 2018.  In the interim, she stayed in a hotel and with friends.

58.  Officer Holmes was aware that the order he had received merely granted possession of the residence to Mr. Marshall for four days.  He was also aware, from the order itself and from *Va. Code Ann.* §16.1-253.4(B)(3), that "no such grant of possession shall affect title to any real or personal property."  Officer Holmes knew that under black-letter law he lacked authority to do anything other than inform Ms. Marshall that she was required to leave her home through July 30, 2018, and presumably arrest her if she refused to do so.

59.  Notwithstanding his limited authority under the magistrate's protective order, Officer Holmes took the occasion of the expulsion of Ms. Marshall from her home to advance a related goal of defendants' conspiracy: gaining access to the house for the Marshall defendants so as to enable them to seize such items as they saw fit.

60.  Before Ms. Marshall left the house, Officer Holmes thus demanded that she give him her key to the house: an item of personal property expressly not within the scope of the protective order being executed by him.  When she resisted, he said, on his own purported authority, that if she did not do so, the locks would be changed and she would be locked out of her own home.  Fearful of such a result, Ms. Marshall gave him her key.

61.  Officer Holmes knew that Mr. Marshall was scheduled to remain in the hospital during the pendency of the order.  He knew that depriving Ms. Marshall of any of her personal

property was expressly prohibited by the order he had solicited and secured, and that it did not advance the sole purpose of the order: ostensibly to secure Mr. Marshall's well-being. Nevertheless, using the power of his badge, he forced Ms. Marshall to deliver her house key to him.

62.  Pursuant to his conspiracy with the Marshall defendants, Officer Holmes proceeded to deliver Ms. Marshall's key to one of them, presumably Robert Marshall or Andrea Voehringer, both of whom then used the key to secure entry into the Marshall home.  Officer Holmes did so in the expectation that the Marshall defendants would enter the house and take what they saw fit to take, which is exactly what happened.

63.  The following morning, July 27, 2018, in aid of defendants' conspiracy, defendant Andrea Voehringer came to Ms. Marshall's house armed with the house key seized by Officer Holmes.  She remained in the house for at least one hour, alone.   Henrico police officers were present outside the house, one in his police car.

64.  A neighbor who had been alerted to the execution of the protective order approached the officer in the car and asked him why the police were not monitoring what was going on in the Marshall home.  The officer effectively told him it was none of his business.

65.  Ms. Voehringer walked out of the Marshall home with assorted documents and other material in her arms.

66.  Another neighbor approached the house.  Seeing Ms. Voehringer removing material from the Marshall home, she called 911 to report that it was being ransacked.  Numerous additional police cars promptly arrived.

67.  The first neighbor who had arrived on the scene told the officer in charge that the police should be monitoring what was being removed from the home and that Ms. Voehringer should be arrested for larceny if she was taking unauthorized material.

68.  The officer in charge responded that what was being taken from the house was "not within police jurisdiction," and that it was now "up to the lawyers" to resolve the matter.  Neither he nor any other officer did anything to interfere with Ms. Voehringer's removal of unknown material from the house.

69.  Seeing defendant Voehringer emptying arms-full of property from Ms. Marshall's home into her car, the second neighbor began filming and photographing this activity and also the police, who were doing nothing to monitor this transfer.  She took these photographs over the threatening objections of a police officer who improperly ordered her to desist.

70.  In response to ongoing objections that Ms. Voehringer was taking material from the Marshall home that she had no business removing, an officer present remarked: "they could burn down the house if they wanted and no one could do anything about it."  The police did nothing to check what Ms. Voehringer was removing from the Marshall home.

71.  Later that day or a subsequent day, defendant Robert Marshall arrived at the house, having obtained Ms. Marshall's key from defendant Voehringer or another defendant.  On information and belief, he too took property belonging to Ms. Marshall from the house, including a television still in its shipping container addressed to her.

72.  On July 30, 2018, at approximately 10:30 P.M., defendant Robert Marshall called Ms. Marshall to advise her that she was free to return home and could retrieve the key to her house from underneath a flowerpot on the front porch.

73.   Having spent the prior nights in a hotel room and then with friends, Ms. Marshall returned home the morning of July 31, 2018.  She had always prided herself on maintaining a neat and tidy house, and had left it in such condition upon being rousted on the night of July 26, 2018.  Upon returning, she found her home trashed.  On information and belief, no one had been in the house in the interim other than defendants Voehringer and Robert Marshall.

74.   In addition to the chaos in the house, the following property belonging to Ms. Marshall, all of which had been in the house before it was entered by defendants, was now missing and remains missing to date; on information and belief, all this property was converted by defendants in furtherance of their conspiracy against Ms. Marshall:

* Various items Ms. Marshall had purchased for her daughters, including socks, toothpaste, toothbrushes, lotions, feminine hygiene products, etc.)

* The certificate of naturalization of Ms. Marshall's first late husband, Taru Advani. This document and others were removed from a pouch provided at the time of Mr. Advani's death by the Scott Funeral Home.  Other papers from that pouch were strewn all over the floor.

* The deed to Ms. Marshall's house from which she had been evicted.

* The marriage license of Cynthia and Watson Marshall.

* Mail, including Internal Revenue Service statements for certain back taxes and copies of tax returns filed by Mr. and Ms. Marshall, bank statements from joint accounts holding more of Ms. Marshall's money than Ms. Marshall's, and copies of statements from several of Mr. Marshall's credit cards on which Ms. Marshall was an authorized signatory.

-19-

\*      A blazer belonging to the late Mr. Advani, with his lapel pin from the Virginia governor's office marking 25 years of successful employment by the Commonwealth.

\*      A new television purchased by Ms. Marshall, still in its shipping container from Best Buy with her name on the shipping label.  On information and belief, this television is now in use in the home of Robert Marshall.

75.  On July 30, 2018, several hours before the emergency protective order evicting Ms. Marshall from her home had expired, defendants returned to JDR court with a petition for a second protective order to be entered pending a hearing to take place in the future. Once again, defendants provided Ms. Marshall with no notice of their second petition, which was adjudicated *ex parte*.  Like their initial petition four days earlier, this petition sought to have Ms. Marshall driven from her home, this time for two weeks until a hearing scheduled for August 13, 2018 would take place.

76.  A different magistrate adjudicated defendants' second petition.  He refused to order Ms. Marshall to be driven from her home.

77.  The Marshall defendants also conspired to cause mail addressed to Ms. Marshall as well as her husband to be diverted, without her knowledge or approval, to Robert Marshall's house and to a newly-acquired post office box secured by Robert Marshall or another of the Marshall defendants.  This included statements from banks in which Ms. Marshall kept her own money.  This mail was then sent to her, on information and belief by Robert Marshall, on or about September 7, 2018.  Some of it had been opened and some not.

78.  On information and belief, one of the Marshall defendants also cancelled airline tickets previously purchased by Ms. Marshall for a planned November 2018 visit to see her daughters in Las Vegas.  Ms. Marshall had purchased the tickets on a credit card on which she and Mr. Marshall were authorized signatories.  Ms. Marshall learned of the cancellation only later, when calling the airline about her reservation.

79.  On August 8, 2018, Watson Marshall died.

80.  The Marshall defendants, all of whom promptly learned of their father's death, did not promptly advise Ms. Marshall, or cause her to be advised, that her husband had died. Rather, they contrived to inform her of his death by serving her with papers at approximately 4 P.M. the following day, August 9, 2018, calling her to a hearing to be held at 9 A.M. the next morning in Henrico Circuit Court on who was to act as next-of-kin and the disposition of Mr. Marshall's remains.   This is how Ms. Marshall learned that her husband had died.

81.  Ms. Marshall experienced enormous shock and distress on learning of her husband's death, exacerbated by the cruel manner in which the Marshall defendants maliciously and gratuitously undertook to inform her of it.

82.  Apart from learning of her husband's death in this appalling manner, Ms. Marshall was left having to secure counsel immediately, notwithstanding the Marshall defendants' perfect awareness that she had received grossly insufficient notice of a judicial proceeding, secured on an emergency basis and of uncertain scope and consequence, to take place the next morning.

83.  Ms. Marshall scrambled to identify counsel willing to assist her at the hearing the following morning.  She was turned down by several Richmond-area lawyers who said, either in so many words or by direct implication, that they could not appear adverse to John Marshall, a

sitting circuit court judge.  Ms. Marshall finally secured counsel who drove in from Manassas to represent her.

84.  In light of defendant John Marshall's involvement in the matter, a circuit judge from another jurisdiction was specially assigned to hear the matter on August 10, 2018.  At issue was the identification of next-of-kin for purposes of determining the disposition of Mr. Marshall's remains and related post-mortem matters.  At the hearing, the judge castigated the Marshall defendants and their counsel for having brought into court on an emergency basis family issues that should have been resolved informally.

85.  Continuing with their conspiracy to distance their now-deceased father from his widow, the Marshall defendants conspired to provide information for their father's death certificate falsely certifying that his last address had been at the home of their mother, his former wife.  According to the death certificate, this information was provided by defendant John Marshall, notwithstanding his awareness, as a judge, that the law required accurate information to appear on such documents. Mr. Marshall's official death certificate was initially issued with this misinformation, before being modified to state his home address with Ms. Marshall.

86.  In furtherance of their project to minimize Ms. Marshall presence in her late husband's life as fully as possible, the Marshall defendants wrote and published an obituary reciting, in pertinent part:

> [Watson Marshall] is survived by Annie C. Marshall, to whom he was married for 58 years; his four loving children, Brenda Thompson (Brent), John Marshall (Sam), Andrea Voehringer (Michael) and Robert Marshall (Heather); 12 loving grandchildren, Brittany and Brooke Thompson, Taylor, Casey and Madison Marshall, Alexandra, Michael and Jakob Voehringer, Sydney, Macy, Alexa and Watson Marshall; his sister, Katie Ellerson (Ray); sisters-in-law, Margie and Jean Marshall; many nieces and

nephews, many loyal friends; and his current wife, Cynthia A.
Marshall and her daughters.

Exhibit 6.  This public, venomous disregard of the sensibilities and moral entitlements of Ms.

Marshall as her husband's loving wife anguished Ms. Marshall greatly.

87.  The Marshall defendants did not permit Ms. Marshall to attend her husband's funeral

service, nor did they advise her when it would take place.  Rather, they directed the funeral home

to grant her a private, one-hour viewing.  Nor did they give her notice of when and where her

husband's interment would take place, publishing the obituary for Mr. Marshall only after the

funeral service and interment had occurred.  As a result, Ms. Marshall did not see her husband

laid to rest.  This gratuitous act of cruelty anguished her greatly.

88.  A one-time lump-sum payment of $255 is available from Social Security to a

surviving spouse who was living with the deceased at the time of the deceased's death.  When, in

due course, Ms. Marshall enquired about that payment, she was informed by the Social Security

officials with whom she spoke, to her shock and mortification, that it had already been paid to

someone identified as Mr. Marshall's surviving spouse.  In support of her claim that she, and no

other woman, was indeed her late husband's widow, Ms. Marshall was directed to provide

information and documentation attesting to her marriage, Mr. Watson's 2015 divorce from

Annie Marshall, and her driver's license.  In due course she was advised that Social Security had

"made a mistake because of misinformation" and that she would receive the modest benefits at

issue.

89.  On information and belief, the Marshall defendants conspired fraudulently to submit

to Social Security their mother's name as their father's surviving spouse, in all likelihood

without  informing their mother of the fraud.  These action by the Marshall defendants amounted to more of their malicious effort utterly to disconnect Ms. Marshall from her late husband.

90.   Defendants' actions set forth above were done intentionally, wilfully, with malice, and in wanton disregard of Ms. Marshall's legal rights and moral entitlement, in furtherance of their conspiracy to obliterate Ms. Marshall as part of the Marshall family.  Their conspiring and causing her to be evicted from her own home for four days for no good cause, and causing her to fear possible additional evictions; their failure to notify her of the death of her beloved husband except in the from of a summons to attend court the next day; their belittling her and her relationship to her late husband in a public obituary; their promulgation of an initial death certificate erasing Ms. Marshall's home from where her husband had lived; their barring her from her husband's funeral service; their making it impossible for her to attend her husband's interment; and their passing their own mother off as their father's surviving spouse to Social Security  – all of those were each, and were altogether, extreme, outrageous, and intolerable, calculated to cause Ms. Marshall severe emotional distress, and did in fact cause her such distress, for which she has secured mental health counseling.

/

/

/

/

/

/

/

-24-

Verification

I, plaintiff Cynthia Advani Marshall, declare under penalty of perjury that the factual

allegations set forth in this complaint are true to the best of my knowledge, information and

belief.

Dated: June 13 2020

Cynthia Advani Marshall

\*

Causes of Action

Count I

Defendant Holmes:  Unconstitutional Eviction

91.  By his actions in knowingly soliciting and securing a legally untenable and factually

baseless order evicting Ms. Marshall from her home for four days, and then executing it as set

forth above, defendant Holmes, acting under color of state law, unreasonably deprived Ms.

Marshall of her property interest in the possession of her own home, protected by the Fourth

Amendment of the United States Constitution and 42 U.S.C. §1983.

Count II

Defendant Robert Marshall: Unconstitutional
Eviction Through Joint Action with Officer Holmes

92. By his actions in enlisting the assistance of Officer Holmes, and with him soliciting

and securing, in bad faith, a legally untenable and factually baseless order evicting Ms. Marshall

-25-

from her home for four days, as set forth above, defendant Robert Marshall engaged in joint action with an officer acting under color of state law to unreasonably deprive Ms. Marshall of her protected property interest in the possession of her own home, in violation of the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983, pursuant to the doctrine of *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

Count III

Defendant: <u>All Defendants:  Conspiracy to Cause Unconstitutional Eviction</u>

91.  By their actions in conspiring to solicit and secure an unreasonable and baseless order evicting Ms. Marshall from her home for four days, and to have it executed as set forth above, all defendants conspired to violate Ms. Marshall's property interest in the possession of her home, protected by the Fourth Amendment of the United States Constitution and 42 U.S.C. §1983.

Count IV(a)

<u>Defendant Holmes: Seizure of Key: Fourth Amendment Violation</u>

92.  Officer Holmes's seizure of Ms. Marshall's key to her home for delivery to the Marshall defendants so as to give them unrestricted access to Ms. Marshall's home, as set forth above, was accomplished without probable cause or other legal authorization, in violation of the Fourth Amendment of the United States Constitution.  This claim is pleaded in the alternative to Count IV(b)

Count IV(b)

Defendant Holmes: Seizure of Key: Fourteenth Amendment Violation

93.    Officer Holmes's seizure of Mrs. Marshall's key to her home, so as to give the

Marshall defendants unrestricted access to Ms. Marshall's home, as set forth above, amounted to

a seizure of her property without due process of law, in violation of the Fourteenth Amendment

of the United States Constitution.   This claim is pleaded in the alternative to Count IV(a).


Count V

All Defendants: Unconstitutional Conspiracy to Deprive of Property

94.  By undertaking to have Officer Holmes obtain the key to the Marshall home so that

the Marshall defendants might have free access to remove from the house what they saw fit, as

set forth above, the Marshall defendants and Officer Holmes conspired, under color of law, to

violate Ms. Marshall's property interest in her personal property  –  including not merely her key

but her personal property thereafter removed by the Marshall defendants  –  protected by the

Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §1983.


Count VI

Defendants Voehringer and Robert Marshall:  Conversion

95.  By their actions set forth in ¶¶67-76 above, defendants Voehringer and

Robert Marshall converted property belonging to Ms. Marshall.

Count VII

Marshall Defendants: Common Law
Conspiracy to Deprive Lawful Owner of Property

96.  As set forth above, the Marshall defendants conspired to cause Ms. Marshall to be wrongfully evicted from her home, wrongfully to secure the key to her home, trash her home, and convert items of her property from her home to their benefit.

Count VIII

All Defendants:  Intentional Infliction of Emotional Distress

97.  By their actions set forth above, all defendants intentionally inflicted emotional distress upon Ms. Marshall.

\*

Wherefore, Ms. Marshall requests an order of this court granting her:

\*       Her actual damages against each defendant appropriate to the proof at trial, including damages awarded jointly and severally against any defendants found to have conspired against her,

\*       Punitive damages against each defendant appropriate to the proof at trial, including punitive damages awarded jointly and severally against any defendants found to have conspired against her,

\*       The return of her converted property,

\*       An award of her costs, including reasonable attorney's fees, and

\*       Such other relief as is just.

Plaintiff requests trial by jury.

                                  Respectfully submitted,

                                  Cynthia Advani Marshall

                                   By counsel

Dated: June 15, 2020

Counsel for Plaintiff:


//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Bernadette E. Valdellon, *pro hac vice* pending
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
bev@robinhoodesq.com
**MarshallCynthia\Drafts\Complaint**