IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CYNTHIA ADVANI MARSHALL,
    Plaintiff,

v.                                                                        Civil No. 3:20cv442 (DJN)

JOHN MARSHALL, *et al*.,
    Defendants.

## MEMORANDUM OPINION

Plaintiff Cynthia Advani Marshall ("Plaintiff") brings this action against Defendants T.W. Holmes ("Officer Holmes") and John Marshall, Robert Marshall, Brenda Marshall Thompson, and Andrea Marshall Voehringer (collectively, the "Marshall Defendants"), alleging violations of the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983 and common law property principles. This matter now comes before the Court on the Motions to Dismiss (ECF Nos. 27, 30, 32, 34, 36) filed by Officer Holmes and the Marshall Defendants.

For the reasons set forth below, the Court hereby DENIES Officer Holmes' Motion to Dismiss (ECF No. 27), Andrea Marshall Voehringer's Motion to Dismiss (ECF No. 32), John Marshall's Motion to Dismiss (ECF No. 34) and Robert Marshall's Motion to Dismiss (ECF No. 36). However, the Court hereby GRANTS Brenda Marshall Thompson's Motion to Dismiss (ECF No. 30) and DISMISSES WITHOUT PREJUDICE all claims against her.

## I.   BACKGROUND

At this stage, the Court must accept as true the facts set forth in the Complaint (ECF No. 1).  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant Motions.

### A.   Factual Background

In 2015, Plaintiff married Watson Melton Marshall ("Mr. Marshall") after he divorced his first wife in 2014 after 58 years of marriage.  (Compl. ¶¶ 2, 6.)  Mr. Marshall had four children with his first wife:  John Marshall, Robert Marshall, Brenda Marshall Thompson and Andrea Marshall Voehringer.  (Compl. ¶ 4.)  At the time of their father's marriage to Plaintiff, Andrea Voehringer resided in Pennsylvania, and the remaining three children resided in Virginia. (Compl. ¶ 4.)  John Marshall serves as a judge of the Henrico County Circuit Court in Virginia. (Compl. ¶ 9.)

During their marriage, Mr. Marshall and Plaintiff resided in Plaintiff's home, which Plaintiff conveyed to herself and Mr. Marshall as tenants by the entirety following their marriage.  (Compl. ¶¶ 7-8.)  Over the next several years, Mr. Marshall's relationship with his four children steadily declined due to their "relentless hostility" towards Plaintiff and the children's ongoing frustration regarding the circumstances of their father's marriage to Plaintiff. (Compl. ¶¶ 9-10.)  Their relationship became so fractious that, eventually, Mr. Marshall communicated to his children that he would not see them without Plaintiff present.  (Compl. ¶ 10.)  John Marshall agreed to "abide by this rule," but indicated that he would no longer see his father because of it.  (Compl. ¶ 10.)  Mr. Marshall's relationship with his other children similarly deteriorated in the ensuing years.  (Compl. ¶ 12.)

In the spring of 2018, Mr. Marshall's health began to decline. (Compl. ¶ 13.) He started to refuse food and drink and began to experience breathing difficulties. (Compl. ¶¶ 13-15.) Eventually, in June of 2018, Mr. Marshall was admitted to Virginia Commonwealth University Hospital for treatment, where he remained hospitalized for several days. (Compl. ¶ 15.) At that time, Mr. Marshall completed a Virginia Advance Directive for Health Care, appointing Plaintiff as his agent to make health care decisions for him. (Compl. ¶ 17.)

Mr. Marshall was readmitted to the hospital on July 18, 2018, after his condition again deteriorated. (Compl. ¶ 18.) Mr. Marshall suffered from several episodes of irrationality and disorientation during his hospitalization. (Compl. ¶ 19.) Plaintiff opted to stay with him in the hospital room on several occasions during this stay in an attempt to help mitigate his symptoms and disorientation. (Compl. ¶ 20.)

According to Plaintiff, on the morning of July 21, 2018, after Plaintiff had spent the night at her husband's bedside, one of Mr. Marshall's daughters, Andrea Voehringer, arrived at the hospital to visit her father. (Compl. ¶ 22.) Andrea suggested that Plaintiff go home and take a break from her hospital duty. (Compl. ¶ 22.) Plaintiff agreed. (Compl. ¶¶ 22-23.)

However, unbeknownst to Plaintiff, this suggestion represented a mere "ploy" to remove her from the hospital room so that Andrea, Robert and John Marshall could secure legal decision-making power for their father and initiate a plan to remove Plaintiff from their father's life. (Compl. ¶ 23.) Specifically, during Plaintiff's absence, the Marshall Defendants summoned a family lawyer to their father's hospital room, where this lawyer proceeded to execute new versions of various legal documents including: (1) a new advance medical directive naming John and Robert as Mr. Marshall's medical agents; and, (2) a new general durable power of attorney that revoked the powers of attorney previously granted to Plaintiff and granted power of

3

attorney, "as broad as possible," to John and Robert. (Compl. ¶ 24.) "[A]n enfeebled Mr. Marshall — he died August 8, 2018 — unable to write properly, affixed his mark" to these documents. (Compl. ¶ 25.)

The Marshall Defendants used this new authority to take several legal steps on their father's behalf. First, on July 23, 2018, two days after the execution of the aforementioned documents, the Marshall family lawyer filed a complaint in the Henrico County Circuit Court, seeking a divorce for Mr. Marshall from Plaintiff. (Compl. ¶ 26.) Mr. Marshall did not sign or mark this document. (Compl. ¶ 26.) Second, using their power of attorney, the Marshall defendants directed the hospital staff and Mr. Marshall's doctor to prevent Plaintiff from accessing her husband. (Compl. ¶ 28.)

Despite these orders, Plaintiff visited her husband on July 25, 2018, believing that the hospital could not bar her from seeing her husband other than by a court order. (Compl. ¶ 29.) However, during her visit, Brenda Thompson discovered Plaintiff in her father's room and told Plaintiff "that she was 'not supposed to be there.'" (Compl. ¶ 31.) A nurse then told Plaintiff that she needed to leave. (Compl. ¶ 31.) Hospital security was called, and upon their arrival, they informed Plaintiff that she was not on Mr. Marshall's list of permitted visitors and, as such, she had to leave. (Compl. ¶ 32.) Any further attempt to visit her husband would constitute trespassing. (Compl. ¶ 32.) This visit represented the last time that Plaintiff saw her husband alive. (Compl. ¶ 34.)

The Marshall Defendants also sought an emergency protective order ("EPO") that would secure Mr. Marshall's isolation from his wife and prevent Plaintiff from entering her home, so that the Marshall Defendants could enter the home and "take what they saw fit." (Compl. ¶ 35.) According to Plaintiff, the Marshall Defendants failed to obtain a statement from their father

supporting the protective order application, so, instead, they "secured the assistance of an officer

with the Henrico County Police Department, defendant T.W. Holmes, to obtain an emergency

protective order for them." (Compl. ¶¶ 36-37.)  Robert prepared a criminal complaint and

affidavit alleging that Plaintiff posed a threat to Mr. Marshall's well-being, and Officer Holmes

filled out a supplementary criminal complaint against Plaintiff based on Robert's affidavit.

(Compl. ¶ 40.)  They certified that Mr. Marshall, "'in hospital/hospice care,' was 'physically or

mentally incapable of filing a petition'" for the EPO on his own behalf.  (Compl. ¶ 28.)

On July 26, 2018, shortly after 10 p.m., Robert and Officer Holmes appeared before

Magistrate Sara Munoz of the Henrico Juvenile and Domestic Relations Court to seek the

emergency protective order.  (Compl. ¶ 41.)  According to Plaintiff, "it was highly unusual for

such an application to be made and immediately granted after 10 p.m., in circumstances where

there was no apparent immediate threat to the person intended to be protected," and that "to

secure the order, defendants traded on the fact that one of the persons supporting the proposed

order was a Henrico Circuit Court judge."  (Compl. ¶ 42.)  According to Plaintiff, Robert and

Officer Holmes also used Mr. Marshall's "dead letter" divorce case as an exhibit to their motion

for the EPO.  (Compl. ¶ 43.)

The magistrate issued the EPO just after 10 p.m., with an expiration date of July 30,

2018, at 11:59 p.m.  (Compl. ¶ 53.)  The EPO included a provision prohibiting Plaintiff from

having any contact with Mr. Marshall and another provision granting Mr. Marshall possession of

the marital home shared by Plaintiff and Mr. Marshall to the exclusion of Plaintiff.  (Emergency

Protective Order (ECF No. 1-5).)  Plaintiff contends that Robert and Officer Holmes "solicited

and received" the EPO containing this exclusion provision despite "[k]nowing that Mr. Marshall

was expected to remain in his VCU hospital bed for at least the duration of their proposed

emergency protective order; [and] knowing that during this period, not to say for a considerably longer period of time, there was no chance that he might return to the home he shared with his wife." (Compl. ¶ 46.)

Shortly after 11 p.m., Officer Holmes and two other Henrico County police officers arrived at Plaintiff's home and served her with the protective order. (Compl. ¶ 54.) They informed her that she needed to vacate the premises within "five to eight minutes" and that she could not return until the expiration of the EPO. (Compl. ¶ 56.) At the time, Plaintiff was in her nightgown, preparing to go to bed. (Compl. ¶ 54.) When Plaintiff sought to change into street clothes, a male officer followed her into her bedroom and said that he would have to remain present as she changed. (Compl. ¶ 57.) Plaintiff refused to change her clothes with the officer present, so she remained in her nightgown. (Compl. ¶ 57.)

Officer Holmes further demanded that Plaintiff give him the key to the house, "an item of personal property expressly not within the scope of the protective order being executed by him." (Compl. ¶ 60.) He told her that if she did not give him the key, he would have the locks changed and she would be locked out of her home. (Compl. ¶ 60.) Officer Holmes made the demand for Plaintiff's key despite knowing that Mr. Marshall was scheduled to remain in the hospital during the pendency of the EPO. (Compl. ¶ 61.) Plaintiff relented and provided her key to Officer Holmes. (Compl. ¶ 60.)

Officer Holmes then proceeded to deliver the key to "one of" the Marshall Defendants, presumably either Robert or Andrea, as they both later used the key to enter the premises. (Compl. ¶ 62.) In doing so, Officer Holmes was aware that the EPO only granted possession of the property to Mr. Marshall for four days. (Compl. ¶ 58.) Yet, according to Plaintiff, Andrea entered the home the next day using the key secured by Officer Holmes, and remained in the

6

house alone for at least an hour.  (Compl. ¶ 63.)  Henrico County police officers waited outside

the home during this time.  (Compl. ¶ 63.)  A neighbor approached the police officers and asked

them why the police were not monitoring Andrea.  (Compl. ¶ 64.)  Andrea then left the house

carrying "assorted documents and other material in her arms."  (Compl. ¶ 64.)  A second

neighbor approached the house, and upon seeing Andrea removing items from the home, called

911 "to report that it was being ransacked.  Numerous additional police cars promptly arrived."

(Compl. ¶ 66.)  The second neighbor began recording both Andrea and the police officers "who

were doing nothing to monitor" Andrea as she "empt[ied] arms-full of property from Ms.

Marshall's home into her car."  (Compl. ¶ 69.)  The officers told the neighbor that "they could

burn down the house if they wanted and no one could do anything about it."  (Compl. ¶ 70.)

Later that day, Robert arrived at the home and took other property belonging to Plaintiff,

including a television.  (Compl. ¶ 64.)  During the late evening of July 30, Robert Marshall

called Plaintiff and told her that she could return to her home and find her key underneath a

flowerpot on the front porch.  (Compl. ¶ 72.)

On July 30, the Marshall Defendants returned to court with a petition for a second

protective order, asking the court to again evict Plaintiff from her home pending a hearing

scheduled for August 13, 2018.  (Compl. ¶ 75.)  However, a different magistrate reviewed the

petition, and he "refused to order [Plaintiff] to be driven from her home."  (Compl. ¶ 76.)

Plaintiff returned to her home on July 31, 2018, after the expiration of the EPO and found

her home "trashed."  (Compl. ¶ 73.)  She noted that various items and documents were missing

from the home, including:  (1) various items that Plaintiff had purchased for her daughters,

including socks, toothpaste and lotions; (2) the certificate of naturalization of her late first

husband; (3) a blazer belonging to her late first husband that included a lapel pin from the

7

Virginia governor's office marking 25 years of employment by the Commonwealth; (4) the deed

to her and Mr. Marshall's home; (5) the marriage license of her and Mr. Marshall; (6) pieces of

mail, including copies of tax returns sent to her by the Internal Revenue Service; (7) bank

statements from her joint accounts with Mr. Marshall and credit card statements; and, (8) a

television purchased by Plaintiff, still in its shipping container with her name on the shipping

label. (Compl. ¶ 74.)

Mr. Marshall died on August 8, 2018. (Compl. ¶ 79.) At approximately 4 p.m. on the

following day, the Marshall Defendants informed Plaintiff of her husband's death by calling to

notify her of a hearing regarding who was to act as Mr. Marshall's next-of-kin. (Compl. ¶ 80.)

The Marshall Defendants did not allow Plaintiff to attend Mr. Marshall's funeral or otherwise

tell her when it would occur. (Compl. ¶ 87.)

## B.      Plaintiff's Complaint

On June 15, 2020, Plaintiff filed her Complaint against Defendants, raising eight counts

for relief based on the above allegations. Count One asserts a claim of Unconstitutional Eviction

against Officer Holmes, alleging that he knowingly solicited, secured and executed a baseless

order evicting Plaintiff from her home in violation of the Fourth Amendment and 42 U.S.C.

§ 1983. (Compl. ¶ 91.) Count Two asserts a claim of Unconstitutional Eviction through Joint

Action against Robert Marshall, alleging that Robert engaged in joint action with an officer

acting under the color of state law to unreasonably deprive Plaintiff of her protected property

interest in violation of the Fourth Amendment and 42 U.S.C. § 1983, pursuant to the doctrine of

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). (Compl. ¶ 92.)

Count Three asserts a claim of Conspiracy to Cause Unconstitutional Eviction against all

Defendants, alleging that they conspired to solicit and secure an unreasonable and baseless order

evicting Plaintiff from her home in violation of the Fourth Amendment and 42 U.S.C. § 1983.
(Compl. ¶ 91.)  Count Four asserts a violation of the Fourth Amendment, or in the alternative,
the Fourteenth Amendment, against Officer Holmes, alleging that his seizure of Plaintiff's house
key amounted to a seizure of her property without due process of the law.  (Compl. ¶ 92-93.)
Count Five asserts a claim for Unconstitutional Conspiracy to Deprive of Property against all
Defendants, alleging that Officer Holmes and the Marshall Defendants conspired under the color
of law to violate Plaintiff's property interests as protected by the Fourth and Fourteenth
Amendments and 42 U.S.C. § 1983.  (Compl. ¶ 94.)

Finally, Count Six asserts a common law claim of conversion against Andrea Marshall
Voehringer and Robert Marshall, and Count Seven asserts a common law claim of conspiracy to
deprive a lawful owner of property against all of the Marshall Defendants.  (Compl. ¶¶ 95-96.)
Plaintiff bases the common law conspiracy claim on her allegations that the Marshall Defendants
conspired to evict her from her home, wrongfully seized the key to her home and then used this
key to destroy her home and take property from it.  (Compl. ¶ 96.)  Count Eight asserts a claim
for intentional infliction of emotional distress ("IIED") against all Defendants, but the Court
granted Plaintiff's Motion to voluntarily dismiss this count on November 30, 2020, leaving only
the first seven counts still in dispute.  (ECF Nos. 62, 63.)

Based on these claims, Plaintiff seeks damages against each Defendant as found
appropriate at trial, punitive damages against each Defendant, the return of her converted
property and the award of costs and reasonable attorney's fees.  (Compl. at 28.)

### C.     Officer Holmes' Motion to Dismiss

In response to Plaintiff's Complaint, Officer Holmes filed a Motion to Dismiss (ECF No.
27), moving to dismiss Plaintiff's claims against him for failure to state a claim under Rule

12(b)(6).  In support of his Motion, Officer Holmes argues that qualified immunity precludes any

recovery against him on Plaintiff's § 1983 claims.  (Mem. in Supp. of Mot. to Dismiss of Officer

Holmes ("Holmes' Mem.") (ECF No. 28) at 9.)  Specifically, he contends that he did not act in

any clearly unlawful manner when he solicited, secured and executed the emergency protective

order under the circumstances as alleged, and no precedent exists even suggesting that he acted

unlawfully.  (Holmes' Mem. at 17-21.)

Officer Holmes also maintains that Plaintiff has failed to allege sufficient facts to

establish a plausible conspiracy to violate any clearly established Fourth or Fourteenth

Amendment rights.  (Holmes' Mem. at 21.)  Putting aside his argument that Plaintiff has failed to

establish that he violated any of her constitutional rights, Officer Holmes contends that Plaintiff

has failed to assert more than conclusory allegations that the Marshall Defendants acted in

concert with Officer Holmes to violate her rights.  (Holmes' Mem. at 22.)  Specifically, the

Complaint lacks "facts establishing any communication or, indeed, any interaction at all among

the purported conspirators" or that Defendants all "shared the same conspiratorial objective."

(Holmes' Mem. at 22-23.)[1]

Plaintiff filed her Opposition to Officer Holmes' Motion to Dismiss on September 28,

2020, (Pl.'s Resp. in Opp'n to Def. Officer Holmes' Mot. to Dismiss ("Pl.'s Holmes Resp.")

(ECF No. 46.), and Officer Holmes filed his Reply on October 20, 2020, (Reply Mem. in Supp.

of Mot. to Dismiss of Officer Holmes) ("Holmes' Reply") (ECF No. 55)), rendering Officer

Holmes' Motion now ripe for review.

---

[1]      Officer Holmes and the Marshall Defendants also make arguments regarding Count
Eight, the intentional infliction of emotional distress claim, but the Court will disregard these
arguments given that Plaintiff has dismissed this claim.

### D.    Marshall Defendants' Motions to Dismiss

Separately from Officer Holmes and from one another, the Marshall Defendants each

filed a Motion to Dismiss (ECF Nos. 30, 32, 34, 36) pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6) on August 24, 2020.

In support of Defendant John Marshall's Motion to Dismiss, he primarily contends that

Plaintiff's claims are barred by the *Rooker-Feldman* doctrine. (Mem. in Supp. of Mot. to

Dismiss of John Marshall ("J. Marshall's Mem.") (ECF No. 35) at 10.) Specifically, he argues

that this Court lacks jurisdiction to review the merits and validity of the emergency protective

order that represents the basis of Plaintiff's constitutional claims, because it constitutes a final

state court judgment. (J. Marshall's Mem. at 12.) He further asserts that the doctrine of issue

preclusion prevents the Court from reconsidering the merits of the protective order. (J.

Marshall's Mem. at 14.) John Marshall also contends that Plaintiff cannot state a claim for relief

against him for any of her conspiracy claims, because she merely alleges conclusory statements

of a conspiracy rather than any plausible facts suggesting a combination, agreement or

understanding among the Defendants. (J. Marshall's Mem. at 16, 19-21.)

Brenda Thompson raises similar arguments as to the *Rooker-Feldman* doctrine and issue

preclusion in support of her Motion to Dismiss. (Mem. in Supp. of Mot. to Dismiss of Brenda

Thompson ("Thompson's Mem.") (ECF No. 31) at 3-6.) Brenda Thompson also contends that

Plaintiff's Complaint is largely devoid of any facts as to Brenda's role in the alleged offenses,

specifically the conspiracy claims. (Thompson's Mem. at 1, 7.)

In Andrea Voehringer's Motion to Dismiss, she adopts the arguments and authorities set

forth in John Marshall's Motion to Dismiss. (Mem. in Supp. of Mot. to Dismiss of Andrea

Voehringer ("Voehringer's Mem.") (ECF No. 33) at 2-3.) These arguments address Counts

11

Three, Five and Seven as alleged against her, leaving only Count Six unaddressed. (Voehringer's Mem. at 3.) As to Count Six, the conversion claim, Voehringer argues that the majority of the items that Plaintiff claims Andrea converted were owned by both Mr. Marshall and Plaintiff, and that therefore they could not have been converted by the Marshall Defendants, because they acted as Mr. Marshall's agents when they took the property. (Voehringer's Mem. at 3.) As for the remaining items owned solely by Plaintiff — some toiletries, Plaintiff's late first husband's blazer and certificate of naturalization and the television — Andrea Voehringer contends that the Court should decline to exercise supplemental jurisdiction over this state law claim. (Voehringer's Mem. at 4-5.)

Finally, in support of his Motion to Dismiss, Robert Marshall asserts similar arguments regarding the *Rooker-Feldman* doctrine and issue preclusion. (Mem. in Supp. of Mot. to Dismiss of Robert Marshall ("R. Marshall's Mem.") (ECF No. 37) at 8-15.) He also contends that witness immunity bars Plaintiff's claims, as it appears from Plaintiff's Complaint that Plaintiff attempts to hold him liable for providing testimony to the magistrate to secure the EPO. (R. Marshall's Mem. at 15.) Robert Marshall further asserts that the Court should dismiss Plaintiff's state law claims upon the dismissal of the § 1983 claims due to the principles underlying the doctrines of supplemental jurisdiction and federalism. (R. Marshall's Mem. at 17-18.) Like the other Marshall Defendants, Robert Marshall also argues that Plaintiff fails to allege facts sufficient to support her conspiracy claims. (R. Marshall's Mem. at 18-22, 23-24.) Finally, he asserts that Plaintiff's common law conversion claim fails, because, as Andrea stated in support of her Motion, any property that Plaintiff alleges that he took was jointly owned by her and Mr. Marshall, for whom Robert acted as an agent. (R. Marshall's Mem. at 22-23.)

Plaintiff filed an Opposition to the Marshall Defendants' Motions to Dismiss on September 28, 2020, (Pl.'s Resp. in Opp'n to Marshall Defendants' Mot. to Dismiss ("Pl.'s Marshall Resp.") (ECF No. 45)), and the Marshall Defendants filed their Replies on October 20, 2020, (Reply Mem. in Supp. of Mot. to Dismiss of Brenda Thompson) ("Thompson's Reply") (ECF No. 56); Reply Mem. in Supp. of Mot. to Dismiss of John Marshall ("J. Marshall's Reply" (ECF No. 57); Reply Mem. in Supp. of Mot. to Dismiss of Andrea Voehringer ("Voehringer's Reply") (ECF No. 58); Reply Mem. in Supp. of Mot. to Dismiss of Robert Marshall ("R. Marshall's Reply") (ECF No. 59)), rendering the Marshall Defendants' Motions now ripe for review.

## II.    STANDARD OF REVIEW

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint. A defendant moving for dismissal for lack of subject matter jurisdiction may either attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or, may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co., Inc.*, 947 F. Supp. 231, 233 (E.D. Va. 1996) (internal citations omitted). In either case, the plaintiff bears the burden of proof to establish jurisdiction. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The Court must dismiss an action if it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C.*

*v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a motion to dismiss, the Court will

accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to

the plaintiff.  *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  However, "the

tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.

     Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts

sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which

it rests[.]'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*,

355 U.S. 41, 47 (1957)).  As the Supreme Court opined in *Twombly*, a complaint or counterclaim

must state "more than labels and conclusions" or a "formulaic recitation of the elements of a

cause of action," though the law does not require "detailed factual allegations."  *Id.* (citations

omitted).  Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the

speculative level," rendering the right "plausible on its face" rather than merely "conceivable."

*Id.* at 555, 570.  Thus, a complaint or counterclaim must assert facts that are more than "merely

consistent with" the other party's liability.  *Id.* at 557.  And the facts alleged must be sufficient to

"state all the elements of [any] claim[s]."  *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761,

765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and

*Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

### III.   ANALYSIS

     The Court begins by noting that, for the purposes of deciding a motion to dismiss, the

Court will only consider those factual allegations set forth in the Complaint.  *Phillips v. LCI*

*Intern., Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  Additionally, the Court may consider documents

attached to the complaint, Fed. R. Civ. P. 10(c), as well as "documents incorporated into the

complaint by reference, and matters of which the court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). In contrast, the Court may not consider exhibits offered by the movants as attachments, as has occurred here, when the contents of the exhibits are in dispute. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166-68 (4th Cir. 2016).

Further, "statements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion." *E.I. du Pont d Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011). Thus, to the extent that Defendants attempt to assert novel factual allegations, challenge the veracity of Plaintiff's allegations or ask the Court to resolve disputes surrounding these allegations as they repeatedly do at various points in their pleadings, the Court will not do so at this stage. Instead, the Court will make "all reasonable inferences" in favor of Plaintiff for the purposes of resolving these Motions. *Id.*

## A.    Claims Against Officer Holmes

Excluding the IIED claim that Plaintiff voluntarily dismissed, Plaintiff's Complaint asserts four causes of action against Officer Holmes: (1) Unconstitutional Eviction pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (2) Conspiracy to Cause Unconstitutional Eviction pursuant to the Fourth Amendment and 42 U.S.C. § 1983; (3) Seizure of Key: Fourth Amendment Violation — or in the alternative — a Fourteenth Amendment Violation; and (4) Unconstitutional Conspiracy to Deprive of Property pursuant to the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983. (Compl. ¶¶ 91-94.) Plaintiff bases these claims on her allegation that Officer Holmes "knowingly solicit[ed] and secur[ed] a legally untenable and factually baseless order evicting Ms. Marshall from her home for four days, and then execut[ed] it," thereby "unreasonably depriv[ing] Ms. Marshall of her property interest in the possession of her home." (Compl. ¶ 91.)

15

Officer Holmes advances several grounds for dismissal of these causes of action. Primarily, he argues that the doctrine of qualified immunity bars Plaintiff's claims based on the issuance of the EPO, because Plaintiff fails to allege that he violated any "clearly established" right by assisting Robert Marshall in securing the order or executing it according to its terms as prescribed by the magistrate. (Holmes' Mem. at 9-12.)   Officer Holmes further maintains that Plaintiff's "bare, conclusory allegations" of a conspiracy between him and the Marshall Defendants fail to establish a plausible conspiracy, and for these reasons, the Court should dismiss Plaintiff's claims against him. (Holmes' Mem. at 21.)

Plaintiff's Complaint broadly contends that the EPO represented "a legally untenable and factually baseless order." (Compl. ¶ 91.)  However, in Plaintiff's response to Officer Holmes' Motion, it appears clear that she more specifically challenges whether Officer Holmes had sufficient grounds to seek and then execute an order that contained a provision excluding Plaintiff from her home absent any indication that she posed a threat to Mr. Marshall by remaining there. (Pl.'s Holmes Resp. at 3.)  Plaintiff contends that Officer Holmes acted unreasonably in his interpretation of both the facts and the EPO statute itself. (Pl.'s Holmes Resp. at 3.)  Regarding factual unreasonableness, she states that "Officer Holmes knew . . . that Watson Marshall was 'currently in hospice care,' and clearly not going home. How this justified expelling a 59-year old woman from her home is for him to explain . . . even if the problem eluded the magistrate." (Pl.'s Holmes Resp. at 3.)  As such, "[n]o reasonable officer could have believed that expelling Ms. Marshall from her home was necessary to the health or well-being of Watson Marshall, who was not anticipated to return to that home during the pendency of the order, . . . and where the order   . . . already required Ms. Marshall to keep away from her husband on pain of arrest." (Pl.'s Holmes Resp. at 7.)

16

Relatedly, as to the unreasonableness of Officer Holmes' interpretation of relevant law, she states that "[t]he objective unreasonableness of Officer Holmes' interpretation of [the EPO statute] is precisely what [she] is claiming. The statute states one purpose and one purpose only 'to protect the health and safety' of an abused family member. Removing Ms. Marshall from her home was untethered to any such end." (Pl.'s Holmes Resp. at 6.) Consequently, Plaintiff argues, Officer Holmes cannot invoke the protections of qualified immunity, as Officer Holmes "knew or should have known that under settled law governing the sanctity of the home, there was no probable cause or other plausible basis for such an eviction to be sought or accomplished." (Compl. ¶ 51.)

### 1. *Qualified Immunity Doctrine*

The doctrine of qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Wingate v. Fulford*, __ F.3d __, 2021 WL 377796, at \*8 (4th Cir. Feb. 4, 2021). In doing so, the doctrine of "[q]ualified immunity 'balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In doing so, it "'gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Barrett v. PAE Gov't Servs., Inc.*, 975 F.3d 416, 429 (4th Cir. 2020) (quoting *Stanton v. Sims*, 571 U.S. 3, 5 (2013)). "Further, qualified immunity is 'immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Gilliam v. Sealey*, 932 F.3d 216,

229 (4th Cir. 2019). "The burden of establishing a qualified immunity defense rests on the official asserting the defense." *Wingate*, 2021 WL 377796, at \*8.

The Supreme Court has determined that a court must apply the doctrine of qualified immunity "unless (1) [the government actor] violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). At the first step, the court must determine whether, when viewing the facts and drawing all reasonable inferences in the light most favorable to the plaintiff, the defendant violated the constitutional rights of the plaintiff. *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019). While the Supreme Court previously required courts to follow these steps in sequential order, it has since held that "while the sequence set forth [ ] is often appropriate, it should no longer be regarded as mandatory." *Pearson*, 555 U.S. at 236 (discussing *Saucier v. Katz*, 533 U.S. 194 (2001)). Now, "judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.*

The Fourth Circuit has provided the following guidance when assessing whether a right was clearly established:

> [A court must] first look to cases from the Supreme Court, this Court, or the highest court of the state in which the action arose. In the absence of directly on-point, binding authority, courts may also consider whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority. The Supreme Court has ruled against defining a right at too high a level of generality and held that doing so fails to provide fair warning to officers that their conduct is unlawful outside an obvious case.

*Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020) (internal quotations and citations omitted). Thus, a showing of "clearly established" requires that "the right allegedly violated must be

established not as a broad general proposition, but in a particularized sense so that the contours

of the right are clear to a reasonable official." *Reichle*, 566 U.S. at 665 (internal quotations and

citations omitted).  This showing requires a high degree of specificity as to the particular

circumstances that the officer faced and how he acted unlawfully in the face of that specific

situation. *Wesby*, 138 S. Ct. at 590 (citing *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015);

*Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

This standard balances the plaintiff's interest in vindicating her constitutional rights with

the interest of the government official in "'reasonably . . . anticipat[ing] when their conduct may

give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quoting

*Davis v. Scherer*, 468 U.S. 183, 195 (1984)).  "Of course, there can be the rare 'obvious case,'

where the unlawfulness of the officer's conduct is sufficiently clear even though existing

precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (citing *Brosseau v.

Haugen*, 543 U.S. 194, 199 (2004)).

For the purposes of the Court's qualified immunity analysis, the Court will first analyze

whether Officer Holmes violated Plaintiff's clearly established rights by securing and executing

an emergency protective order that evicted Plaintiff from her home and will then assess whether

seizing Plaintiff's house key from her possession and delivering it to the Marshall Defendants for

the duration of the EPO violated Plaintiff's clearly established rights.

>          i.       **Securing the Emergency Protective Order and Evicting**
>                   **Plaintiff from Her Home Constituted a Violation of "Clearly**
>                   **Established" Law Under the Facts as Alleged.**

As an initial matter, the constitutional right that Plaintiff seeks to vindicate through this

action is her Fourth Amendment "right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  While

the language of this Amendment forms a baseline for this right, the exact contours prove much broader. "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). Thus, at "the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).

The Supreme Court has made clear that the eviction of one from their home implicates the protections of the Fourth Amendment. *Soldal v. Cook Cty.*, 506 U.S. 56, 61-72 (1992). And these protections apply "in the civil context as well." *Id.* at 67. As the Court elaborated:

> In our view, the reason why an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question whether the Amendment applies. What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all.

*Id.* at 69. These protections also encompass personal effects inside of a residence. *Id.* at 62 n.7.

The Fourth Circuit has added that a deprivation need not be complete "to constitute a seizure subject to constitutional protections. Rather, the Fourth Amendment also governs temporary or partial seizures." *Presley v. City of Charlottesville*, 464 F.3d 480, 487 (4th Cir. 2006). Indeed, "the Supreme Court has held that the seizure of property occurs whenever 'there is some meaningful interference with an individual's possessory interests in that property.'" *Id.* (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). "Forcible eviction of tenants, even if in a more peaceful or traditional manner than in *Soldal*, is by its very nature a meaningful interference with their possessory interests and is therefore no less a deprivation of their constitutional rights when carried out by law enforcement officers in the absence of a legal basis for doing so." *Thomas v. Cohen*, 304 F.3d 563, 573 (6th Cir. 2002). Thus, "[i]t is clearly established that the police violate the Fourth Amendment when they remove a cotenant from

20

jointly owned premises without a reasonable basis for doing so." *Patterson v. Yeager*, 2016 WL 589881, at *10 (S.D. W.Va. Feb. 11, 2016).

The decision in *Soldal* offers guidance here. In the midst of eviction proceedings, but before entry of an eviction order, a mobile home park enlisted the local Sheriff's Department to participate in the forcible eviction of the plaintiffs' mobile home from the park. 506 U.S. at 57-60. The Court found that the "unceremonious" dispossession of the mobile home from plaintiffs clearly implicated their Fourth Amendment rights. *Soldal*, 506 U.S. at 61-62. While this decision constituted a potentially significant expansion of the Fourth Amendment's application, the Court qualified its decision by explaining the burden that plaintiffs would need to meet to prove that a "seizure" of this type actually violated the Fourth Amendment:

> More significantly, reasonableness is still the ultimate standard under the Fourth Amendment, which means that numerous seizures of this type will survive constitutional scrutiny. As is true in other circumstances, the reasonableness determination will reflect a careful balancing of governmental and private interests. Assuming for example, that the officers were acting pursuant to a court order . . . as often would be the case, a showing of unreasonableness on these facts would be a laborious task indeed . . . .

*Id.* at 71 (internal citations and quotation marks omitted).

Ultimately then, the Fourth Amendment issue implicated here focuses on reasonableness — a reasonable officer would know that he must act in an objectively reasonable manner when conducting an eviction, and that this reasonableness determination often turns on whether a valid judicial order has authorized the officer's conduct. *Id.*; *see also Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) (finding in the context of arrests and searches that "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner").

However, it is also clearly established that an officer's reliance on a judicial order does not end the inquiry into reasonableness. Indeed, "police may sometimes run afoul of the Fourth

Amendment despite their best efforts not to do so." *United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018). In the context of search warrants, the Supreme Court has observed that although searches authorized by a warrant "will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search . . . it is clear that in some circumstances the officer will have no reasonable grounds for believing the warrant was properly issued." *United States v. Leon*, 468 U.S. 897, 922-23 (1984). "A warrant will not preclude a civil suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Graham v. Gagnon*, 831 F.3d 176, 183 (4th Cir. 2016) (quoting *Messerschmidt*, 565 U.S. at 547).

In accordance with this principle, the Supreme Court has identified four circumstances in which an officer's good faith reliance on an otherwise validly issued warrant would prove unreasonable:

> (1) the magistrate was misled by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless disregard of the truth;
>
> (2) the magistrate wholly abandoned his detached and neutral judicial role;
>
> (3) the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
>
> (4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid.

*United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (citing *Leon*, 468 U.S. at 923).

The Fourth Circuit has repeatedly reaffirmed the applicability of these exceptions. *See, e.g.*, *United States v. McKenzie-Gude*, 671 F.3d 452, 460 (4th Cir. 2011) (finding that court may

consider uncontroverted facts known to officer that officer inadvertently failed to disclose to the magistrate in determining reasonableness of officer's reliance on otherwise facially deficient warrant); *United States v. Dickerson*, 166 F.3d 667, 694 (4th Cir. 1998) (finding in "light of the totality of the circumstances," that warrant "was not so facially deficient as to preclude reasonable reliance on it"). The Fourth Circuit has also expanded on these principles, noting that the protections of the good faith doctrine should not apply when an officer submits only a "bare bones" affidavit "that contains 'wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.'" *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) (quoting *United States v. Laury*, 985 F.2d 1293, 1311 n. 23 (5th Cir. 1993)). In such circumstances, an officer does not act in an objectively reasonable way, because an officer should have known that he "did not provide the magistrate with a substantial basis for determining the existence of probable cause." *Id.* at 123 (internal quotations omitted); *see also United States v. DeQuasie*, 373 F.3d 509, 521 (4th Cir. 2004) (affirming *Wilhelm* and stating the same).

The Court finds these same principles applicable here. An objectively reasonable officer would have known at the time that Officer Holmes executed the EPO that he could not rely in good faith on an order that, in light of the totality of the circumstances, proved so facially deficient or lacking in evidentiary support that his official belief in its validity proved entirely unreasonable. Thus, for qualified immunity purposes, the Court must consider whether Officer Holmes acted in an objectively reasonable way when he relied on the EPO issued by the magistrate to secure Plaintiff's eviction from her home.

On the facts as alleged, the Court finds that Officer Holmes did not. The EPO statute states that any "judge of a circuit court, general district court, juvenile and domestic relations

district court or magistrate," may issue an *ex parte* order "in order *to protect the health or safety of any person.*" Va. Code § 16.1-253.4(A) (emphasis added).  Based on the assertions under oath of either a law-enforcement officer or an alleged victim, a judge or a magistrate may issue an ex parte order upon a finding "that reasonable grounds exist to believe that the respondent has committed family abuse and there is probable danger of a further such offense against a family or household member by the respondent." Va. Code § 16.1-253.4(B).  In the order, the judge or magistrate may impose certain conditions on the respondent, including "prohibiting acts of family abuse or criminal offenses that result in injury to person or property," "prohibiting such contacts by the respondent with the allegedly abused person or family or household members of the allegedly abused person" and "[g]ranting the family or household member possession of the premises occupied by the parties to the exclusion of the respondent." Va. Code § 16.1-253.4(B)(1-3).  Additionally, "a law-enforcement officer may request an emergency protective order pursuant to this section" on the victim's behalf. Va. Code § 16.1-253.4(D).  The EPO automatically expires at 11:59 p.m. on the third day following its issuance. Va. Code § 16.1-253.4(C).

The purpose of the statute could not prove clearer in its stated objective to "protect the health or safety of any person." Va. Code § 16.1-253.4(A).  Indeed, the statute and the *emergency* orders authorized therein are plainly intended to address the exigency of on-going domestic violence situations.  The conditions that magistrates are authorized to include as part of the EPO seek to further this clear objective.  Certainly, the condition that grants a family or household member possession of a shared dwelling serves to remove the abuser from the household for a limited period of time to allow the victim to reside safely in their home until either the situation abates or additional legal proceedings can occur.

But this objective was not implicated here.  The alleged victim was hospitalized — in fact, on his death bed — and therefore had no capacity to return to the home, a fact that Officer Holmes well knew according to Plaintiff's allegations.  In fact, according to Plaintiff, Officer Holmes:

> [*Knew*] that Mr. Marshall was expected to remain in his VCU hospital bed for at least the duration of their proposed emergency protective order; [*knew*] that during this period, not to say for a considerably longer period of time, there was no chance that he might return to the home he shared with his wife (he died two weeks later); [*knew*] that the magistrate could, as he then did, issue a form order directing Ms. Marshall "to have no contact of any kind" with Mr. Marshall, nor be in his "physical presence". . .

(Compl. ¶ 46 (emphasis added).)  Nothing in these facts suggests that Plaintiff's removal from her home, even for a brief period of time, was necessary to secure the safety and health of her husband.  Indeed, from Plaintiff's allegations, Officer Holmes had no reason, much less a reasonable one, to believe that the circumstances justified the issuance and then execution of an emergency order that evicted Plaintiff from her home.  Such an extreme application of the EPO statute's reach would allow petitioners to regularly secure evictions untethered to any justifiable ends in clear violation of the Fourth Amendment.  As stated by the Fourth Circuit and applicable here, the Fourth Amendment reasonableness inquiry "is ultimately an 'objective' one.  And objectively speaking, what transpired here is not acceptable . . . Law enforcement can do better." *Lyles*, 910 F.3d at 797.

Because the Court finds that it was a clearly established violation of the Fourth Amendment to evict a private citizen from their home pursuant to a facially deficient order and absent other circumstances that rendered the officer's actions a reasonable intrusion on that citizen's Fourth Amendment rights, the Court declines to extend the protections of qualified immunity to Officer Holmes on this claim.

A further comment about Officer Holmes' conduct, as well as that of his fellow officers, at the time of the eviction deserves mention here. While the Court finds Officer Holmes' reliance on the EPO unreasonable at this stage, it also finds the manner of execution of the order unreasonable on the facts as alleged. As stated by the Fourth Circuit, "[r]easonableness has many dimensions. One must be the proportionality between the gravity of the offense and the intrusiveness of the search." *Lyles*, 910 F.3d at 795. Of course, in "executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Los Angeles Cty. v. Rettele*, 550 U.S. 609, 614 (2007). Indeed, this principle applies with some importance to circumstances where officers are concerned about the imminent loss of evidence. *United States v. Banks*, 540 U.S. 31, 38 (2003).

Applied here, though, these principles demonstrate that the officers unreasonably executed the EPO. Concerns for officer safety, the destruction of evidence or any other emergency issues were clearly not implicated — the officers were executing the EPO at night on a 57-year-old woman in her nightgown preparing herself for bed. Yet, a male officer entered her home, commanded her to leave in "five to eight minutes" and then followed her into her bedroom and "said that he would have to remain present as she changed." (Compl. ¶ 57.) Certainly, Plaintiff did not pose such a threat to either the officers or her husband — who was sick on his death bed miles away — to necessitate an armed escort (a male officer, nonetheless) into the most private spaces of her home. Such conduct by the officers, apparently directed by Officer Holmes, also proved an unreasonable intrusion on her Fourth Amendment rights.

26

      **ii.**    **Seizing Plaintiff's House Key and Delivering it to Robert and Andrea Marshall Violated Plaintiff's "Clearly Established" Rights Under the Facts as Alleged.**

Officer Holmes' seizure of Plaintiff's house key also violated Plaintiff's clearly established rights under the Fourth Amendment. As stated, Plaintiff's allegations establish that Officer Holmes committed a violation of clearly established precedent when he evicted Plaintiff from her home pursuant to an invalid order. Given that Officer Holmes seized Plaintiff's house key to facilitate this eviction and ensure Plaintiff's exclusion from her home pursuant to this invalid order, this seizure likewise proves a violation of clearly established precedent. Certainly, if Officer Holmes could not have reasonably believed that the facts warranted the eviction, he also could not have reasonably believed that the facts warranted seizing Plaintiff's house key to fully effectuate this eviction.

Moreover, the seizure of the key occurred without a warrant or any other basis. The Supreme Court made clear in *Soldal* that the Fourth Amendment also protects one's "personal effects." *Soldal*, 506 U.S. at 62 n.7. And that the key at issue pertains to the Plaintiff's home takes on added importance due to the preeminence of one's home under the Fourth Amendment. *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018). Essentially, by seizing Plaintiff's key, Officer Holmes seized control of her house. Any police officer remotely competent would recognize the need to procure a warrant in this situation, absent some recognized exception, none of which are applicable here. *Hupp*, 931 F.3d at 326-30. Officer Holmes elected not to do so.

It bears emphasizing that the EPO — even if valid — did not authorize the seizure of any property. The EPO merely authorized the executing officer to grant possession of the property to Mr. Marshall "to the exclusion of" Plaintiff. (Emergency Protective Order (ECF No. 1-5) at 1.) In other words, it simply directed Plaintiff to stay away from Mr. Marshall and to leave the

residence for three days to allow Mr. Marshall to return to his home — nothing more. Moreover, had there actually been a valid basis for Officer Holmes to seize Plaintiff's key, he could have proceeded as any reasonable police officer would have done: sought a seizure warrant from the magistrate at the same time that he procured the EPO.

Yet, Officer Holmes' trampling of Plaintiff's Fourth Amendment rights did not end with simply seizing her key. According to the Complaint, Officer Holmes then delivered the key to two private citizens, who had no legal claim to Plaintiff's residence or her belongings, thereby allowing them to pillage her home in ways completely abhorrent to the Fourth Amendment. In doing so, Officer Holmes violated Plaintiff's clearly established Fourth Amendment rights by delivering Plaintiff's house key and, thus, possession of her home to a third party without legal authorization to possess the home.

According to Plaintiff's allegations, Officer Holmes delivered Plaintiff's house key to the Marshall Defendants, "presumably Robert Marshall or Andrea Voehringer, *both of whom* then used the key to secure entry into the Marshall home." (Compl. ¶ 62 (emphasis added).) In fact, the next morning "Andrea Voehringer came to Ms. Marshall's house armed with the house key seized by Officer Holmes [and] remained in the house for at least one hour, alone." (Compl. ¶ 63.) Andrea Voehringer did not appear to have any legal authority to act on behalf of Mr. Marshall or otherwise receive possession of his and Plaintiff's home.

In *Soldal*, the Supreme Court acknowledged that an individual's Fourth Amendment rights are implicated when an officer facilitates the dispossession of an individual's property by a private citizen without legal authorization for the dispossession. 506 U.S. at 58-59 (officers agreed to oversee the trailer park manager's removal of the mobile home and "forestall any resistance," despite knowing that the manager "did not have an eviction order and that its actions

were unlawful"). While *Soldal* ultimately never addressed whether the officers' actions violated the Fourth Amendment, other circuit courts have found a violation in similar circumstances.

In *Cochran*, the Sixth Circuit found that "participation of deputy sheriffs in an improper seizure of personal property for sale constitutes a seizure in violation of the Fourth Amendment." *Cochran v. Gilliam*, 656 F.3d 300, 307 (6th Cir. 2011) (internal quotations and alterations omitted). The court explained:

> [While] an officer's mere presence at the scene to keep the peace while parties carry out their private repossession remedies does not render the repossession action that of the state . . . where officers take an active role in a seizure or eviction, . . . courts have held that the officers are not entitled to qualified immunity. This is particularly true when there is neither a specific court order permitting the officers' conduct nor any exigent circumstance in which the government's interest would outweigh the individual's interest in his property.

*Id.* at 308. The Tenth Circuit has likewise found that "an officer's assistance in a private party's seizure of property implicates Fourth Amendment protections" and that officers are on notice that they "could be liable for assisting a private party's unlawful seizure of property." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1118 (10th Cir. 2008).

Finally, in the context of search warrants, the Fourth Circuit has stated that there is "no doubt that the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant. Such a search is not 'reasonable.'" *Buonocore v. Harris*, 65 F.3d 347, 356 (4th Cir. 1995). In *Buonocore*, an officer allowed a private citizen to conduct an "independent, general search" of a home, despite the fact that the officer "only requested and only was issued a warrant for himself and another 'authorized officer' to search" the premises. *Id.* at 353. In finding that the plaintiff had alleged a violation of his Fourth Amendment rights based on these facts, the Fourth Circuit concluded that "[t]he right to be free

29

from government officials facilitating a private person's general search . . . is 'manifestly included' within 'core' Fourth Amendment protection." *Id.* Indeed, "to conclude otherwise would authorize law enforcement officers to invite private individuals to engage in conduct that would constitute trespass were it not conducted under the guise of a search warrant." *Id.* at 359.

From the principles set forth in these cases, it proves clearly established that a Fourth Amendment violation has occurred when an officer knowingly assists or facilitates a private citizen's unlawful search or seizure of another citizen's property. Therefore, based on the allegations set forth in the Complaint, a reasonable officer in Officer Holmes' position would have known that facilitating Andrea's illegal entry into and subsequent looting of Plaintiff's home by delivering the house key to her constituted a violation of Plaintiff's Fourth Amendment rights.[2]

The same conclusion applies to Robert Marshall as well. As conceded by Plaintiff, both John and Robert Marshall had power of attorney for Mr. Marshall "as broad as possible." (Compl. ¶ 24.) However, the Court anticipates that the validity of the power of attorney will be an issue heavily litigated should this case go to trial. Regardless, even assuming that the power of attorney proves valid, this power did not authorize Robert Marshall to enter the Plaintiff's home, "ransack" and "trash" it and steal items of personal property that did not belong to either

---

[2]     This conclusion is underscored by the fact that numerous private citizens saw what Andrea was doing to Plaintiff's property and felt the need to record her actions and the actions of those police officers who were monitoring Andrea. (Compl. ¶ 66.) In fact, these citizens were so disturbed by her actions, that they called 911 on the police. (Compl. ¶ 66.) Certainly, if these citizens knew that what happened here was wrong, an individual tasked with knowing and enforcing the law would have known the same.

him or his father.[3]  Yet, according to the Complaint, Officer Holmes gave the key to Robert and

Andrea "*in the expectation that* the Marshall Defendants would enter the house and take what

they saw fit to take."  (Compl. ¶ 62 (emphasis added).)  As alleged, Officer Holmes actions in

giving Robert Marshall the house key to facilitate his illegal seizure of Plaintiff's property far

exceeded the reasonable bounds of what either the EPO or Robert Marshall's power of attorney

authorized.

Further troubling is the Complaint's allegation that Officer Holmes' fellow officers

watched as Andrea and Robert looted Plaintiff's home, while allegedly telling her neighbors that

the Marshall Defendants could "burn down the house if they wanted."  (Compl. ¶ 70.)  While this

statement did not come from Officer Holmes, it points to the extreme unreasonableness of the

actions that permeated this entire three-day incident.  That Henrico County police officers

watched as Andrea and Robert looted Plaintiff's home with impunity renders Officer Holmes'

conduct even more suspect, particularly if discovery reveals that he directed his colleagues to

stand idly by as the plundering occurred.  Surely, police officers in executing the EPO could not

have reasonably believed that this temporary order that — by its explicit terms — did not affect

title to any property named therein would allow others to pillage a citizen's home during the

three-day period of its pendency.

As stated, the EPO serves as a mechanism by which the court system can secure the

safety of a victim of domestic abuse on an emergency basis.  It does not serve as a mechanism by

which disgruntled citizens may claim the protections of the court system to further the ends of

---

[3]      The statutory authority granted to an individual with power of attorney as it pertains to
real property is clearly laid out in Virginia's Uniform Power of Attorney Act.  Va. Code § 64.2-
1625.  Nowhere does it state that power of attorney grants that individual the power to enter the
home of the principal and remove property that does not belong to the principal for the agent's
own use or purposes.

their private grudges and wreak havoc on the lives of their personal enemies without consequence.  A reasonable officer in Officer Holmes' position would have known this, and would have known that facilitating either Andrea Voehringer's or Robert Marshall's entry into Plaintiff's home by giving them Plaintiff's house key with the expectation that they would enter the home and convert items of her personal property for their own use constituted a violation of Plaintiff's Fourth Amendment rights.

To conclude otherwise at this stage would constitute a judicial authorization of official actions that facilitate and support the intentionally tortious conduct of private citizens.  For these reasons, the Court also finds the doctrine of qualified immunity inapplicable to Plaintiff's "Seizure of Key" claim under the facts as alleged.

### 2.    *Unconstitutional Conspiracy Claims*

The Court now turns to Officer Holmes' arguments regarding Plaintiff's unconstitutional conspiracy claims.  Officer Holmes contends that Plaintiff has not established that Officer Holmes has violated any of her constitutional rights, and that regardless, the facts alleged in the Complaint fall short of establishing that Officer Holmes acted in concert with the Marshall Defendants "under any agreement, tacit or otherwise, in furtherance of the conspiracy to achieve the same objective." (Holmes' Mem. at 22.)

To establish a claim under § 1983, a plaintiff must allege that the defendant "(1) deprived a plaintiff of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was performed under color of" state law. *Phillips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  To establish a civil conspiracy under § 1983, a plaintiff must present evidence that the defendants (1) "acted jointly in concert" and (2) performed some "overt act" (3) "in furtherance of the conspiracy" that resulted in the deprivation of a constitutional right.

*Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Because a "meeting of the minds" represents a critical element of a conspiracy, "[t]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Wiggins v. 11 Kew Garden Court*, 497 F. App'x 262, 264 (4th Cir. 2012) (citing *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010)). "While Plaintiff does not need 'to produce direct evidence of a meeting of the minds' to prove his claim, ultimately, he will have to 'come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective.'" *Harrison v. Prince William Cty. Police Dep't*, 640 F. Supp. 2d 688, 707 (E.D. Va. 2009) (quoting *Hinkle*, 81 F.3d at 421)). As such, conclusory allegations of a conspiracy will not suffice. *Smalls v. Binner*, 2015 WL 8335735, at \*4 (W.D. Va. Dec. 8, 2015).

Having already established that Officer Holmes' actions — as alleged — violated Plaintiff's Fourth Amendment rights, the Court turns to the other elements of this claim. As an initial matter, it appears clear from Plaintiff's claims that Officer Holmes acted "jointly in concert" with the Marshall Defendants as he "agreed" to seek and obtain the EPO excluding Plaintiff from her home at their request, despite no basis for believing that such an eviction was necessary to serve the express purposes of the statute. (Compl. ¶ 37.) Moreover, Plaintiff alleges that Officer Holmes "was keen to act in support of defendant John Marshall . . . to secure an improper *ex parte* order," further suggesting the joint and concerted action required by this cause of action. (Compl. ¶ 2.)

Finally, viewing the facts as alleged in the Complaint through a lens most favorable to Plaintiff, the Court can identify several acts that Officer Holmes completed in furtherance of the alleged conspiracy, including filling out a criminal complaint against Plaintiff based on Robert

Marshall's affidavit to secure the EPO, petitioning the magistrate for an EPO excluding Plaintiff from her home despite knowing that Mr. Marshall would not return during the pendency of the order and delivering Plaintiff's house key to Andrea Voehringer or Robert Marshall without any legal authorization for doing so, thereby allowing them to gain access to Plaintiff's home and personal property.

These facts prove sufficient to establish that Officer Holmes participated in both a conspiracy to unconstitutionally evict Plaintiff from her home, as well as a conspiracy to unconstitutionally deprive her of her property. Therefore, the Court hereby DENIES Defendant Officer Holmes' Motion to Dismiss.

### B.    Claims Against the Marshall Defendants

The Court now turns to the Motions to Dismiss filed by the Marshall Defendants. The Marshall Defendants primarily contend that the *Rooker-Feldman* and res judicata doctrines bar Plaintiff's claims. (J. Marshall's Mem. at 10-15; R. Marshall's Mem. at 8-15; Voehringer's Mem. at 2-3; Thompson's Mem. at 3-6.) The Marshall Defendants also argue that Plaintiff has failed to allege facts sufficient to support any of her conspiracy claims. (J. Marshall's Mem. at 15-21; R. Marshall's Mem. at 18-22; Voehringer's Mem. at 2-3; Thompson's Mem. at 3.) Specifically, they contend that Plaintiff has failed to plead plausible facts indicating that Defendants engaged in any concerted action or that an agreement existed among them. (J. Marshall's Mem. at 16-17; R. Marshall's Mem. at 19; Voehringer's Mem. at 3; Thompson's Mem. at 7.)

Brenda Marshall adds that the Complaint contains only three mentions of her in its 97 paragraphs, and that none of these mentions provide a factual basis supporting her involvement in the alleged conspiracy. (B. Thompson's Mem. at 8.) Robert Marshall also argues that witness

34

immunity bars Plaintiff's claims as to him, given that he provided an affidavit in support of the EPO, and Plaintiff implies that the Court should hold him liable for providing testimony to the magistrate in support of the EPO. (R. Marshall's Mem. at 15.)

Finally, both Robert Marshall and Andrea Voehringer contend that the conversion claim against them also fails, because most of the goods that Plaintiff alleges that they wrongfully took from Plaintiff's home belonged to Mr. Marshall and, because Robert Marshall had power of attorney for Mr. Marshall, it was in fact Mr. Marshall "by and through his agents" who took the property from Plaintiff's home. (Voehringer's Mem. at 4; R. Marshall's Mem. at 22.) Robert Marshall also argues that nothing in the house constituted Plaintiff's "sole property" under Virginia's marital property laws, so Plaintiff cannot claim that he or Andrea took any personal property that belonged only to her. (R. Marshall's Mem. at 21-22.) In the alternative, Andrea contends that the Court should decline to exercise supplemental jurisdiction over the remaining items if the Court dismisses the other constitutional claims against her. (Voehringer's Mem. at 4.)

### 1.   *Applicability of the* Rooker-Feldman *Doctrine*

The *Rooker-Feldman* doctrine generally prevents federal district courts from reviewing state court decisions. *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923). "Under the *Rooker-Feldman* doctrine, a 'party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court.'" *Am. Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 316 (4th Cir. 2004) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994)).

While courts rather liberally applied the *Rooker-Feldman* doctrine following its establishment, the Supreme Court has since clarified the "narrow ground" that this doctrine

occupies. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Importantly, this doctrine only applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review of those judgments." *Id*. Thus, to successfully raise a *Rooker-Feldman* challenge, the party asserting the doctrine must show that (1) the party raising the claim lost in state court; (2) the party's injuries were caused by the state court judgment; (3) the party's claims invite the district court to review and reject the state court judgment; and, (4) the state court judgment was rendered before the federal proceedings commenced. *Id.*

Importantly, this doctrine applies not just to "constitutional claims presented or adjudicated by the state courts but also to claims that are 'inextricably intertwined' with a state court judgment." *Jordahl v. Democratic Party of Virginia*, 122 F.3d 192, 199 (4th Cir. 1997) (quoting *Feldman*, 460 U.S. at 486-87). "[I]f the state-court loser seeks redress in the federal district court for the injury caused by the state-court decision, his federal question is, by definition, 'inextricably intertwined' with the state-court decision, and is therefore outside of the jurisdiction of the federal district court." *Davani v. Virginia Dep't of Transp.*, 434 F.3d 712, 719 (4th Cir. 2006); *see also Washington v. Wilmore*, 407 F.3d 274, 279 (4th Cir. 2005) ("The 'inextricably intertwined' prong of the doctrine bars a claim that was not actually decided by the state court but where success on the federal claim depends upon a determination that the state court wrongly decided the issues before it.") (internal quotation marks omitted); *see also Shooting Point, LLC v. Cumming*, 368 F.3d 379, 383 (4th Cir. 2004) ("A federal claim is 'inextricably intertwined' with a state court decision if success on the federal claim depends upon a determination that the state court wrongly decided the issues before it."). Indeed, a

36

litigant may not attempt to circumvent the *Rooker-Feldman* doctrine by simply refashioning an attack on a state court judgment as some other kind of claim. *Am. Reliable Ins.*, 336 F.3d at 316; *see also Jordahl*, 122 F.3d at 202 (applying the *Rooker-Feldman* doctrine despite plaintiff challenging the state court judgment under the guise of a § 1983 claim); *Fortune v. Mulherrin*, 533 F.2d 21, 22 (1st Cir. 1976) ("[T]he allegation that an unconstitutional result has been reached does not vest the federal courts with jurisdiction to review the state proceedings collaterally.") (internal quotations omitted).

As an initial matter, while Plaintiff's constitutional claims depend in large part on her claim that the magistrate issued a "legally untenable and factually baseless protective order," she also challenges whether it constituted an unreasonable violation of her rights for Officer Holmes and the Marshall Defendants to seek an EPO at all and to evict her despite knowing that no justification existed to do so. She also claims that it constituted a further violation of her constitutional rights for Officer Holmes to seize her house key and deliver it to the Marshall Defendants. The answer to these questions does not necessarily turn on the validity of the EPO.

Importantly though, this case also turns on the extreme manipulation that allegedly led to the order's issuance, rather than the validity of the order itself. According to Plaintiff's allegations, Defendants schemed to acquire power of attorney from a feeble, incapacitated and dying man. Presumably using this questionably acquired authority, they then submitted an *unsigned* divorce complaint on behalf of their father who they days later described as being "in hospital/hospice care" and "incapable of filing a petition on his own behalf." (Compl. ¶ 26.) In turn, they used this unsigned divorce complaint as an exhibit to support their EPO petition. (Compl. ¶ 43.) This was all accomplished in the same court system and district where one of the Defendants serves in the very powerful and influential position of a Circuit Court judge.

37

Certainly then, a review of the validity of the EPO does not alone determine the success of Plaintiff's claims and, therefore, they prove not so "inextricably intertwined" with the magistrate's decision to issue the EPO as to fall within the ambit of the *Rooker-Feldman* doctrine.

Regardless, the *Rooker-Feldman* does not bar the Court from reviewing the validity of the EPO itself, as several factors persuade the Court that the emergency protective order issued by the state magistrate did not constitute a final state court judgment and Plaintiff does not constitute a state court loser. First, a non-lawyer magistrate issued the EPO as opposed to a judge. *See* Va. Code § 19.2-37(B) (setting the requirement that a person appointed as a magistrate merely be required to have a bachelor's degree if appointed after July 1, 2008, and noting that if the individual was appointed before this date, they need not even have that). Additionally, the magistrate issued the order in an *ex parte* proceeding. Plaintiff, as the respondent to the emergency order, did not receive notice of the hearing before it occurred. Thus, she did not have an opportunity to challenge the facts presented against her or otherwise litigate her case before the alleged constitutional violation took place. The magistrate provided no opinion or other recorded statement detailing the reasons for the EPO's issuance.

Furthermore, the EPO statute offers the respondent no opportunity to raise her constitutional claims in state court. While, pursuant to the statute, Plaintiff could have filed a separate motion requesting a hearing to dissolve or otherwise modify the EPO, this amounts to neither an appeal of the entry of the order itself nor an opportunity to litigate the question of whether the magistrate violated her constitutional rights by issuing the order and evicting her from her home. Because this suit represents the first opportunity for Plaintiff to assert that the EPO and the eviction that ensued from its issuance violated her Fourth Amendment rights, the

Court cannot say that she either "lost" in state court or that these proceedings amount to an appeal of a state court judgment.

Finally, the EPO did not constitute a "final" judgment, as the EPO terminated at the end of the 72-hour period with no apparent lasting obligations for either the respondent or the alleged victim. In fact, Defendants attempted to renew the order after it expired, thereby demonstrating the temporary nature of the EPO, but a second magistrate, considering the same set of facts, declined to issue a second order evicting Plaintiff from her home. (Compl. ¶ 75.) This fact underscores the temporary and non-binding nature of these orders. In sum, the Court fails to see how an *ex parte* emergency order, issued by a non-judge, that gave the respondent no opportunity to raise a constitutional claim regarding its issuance and that expired within three days of its issuance without any ongoing legal obligations to the parties to it represents a final judgment of a state court, much less falls within the ambit of the *Rooker-Feldman* doctrine.

Importantly, in the analogous context of search and arrest warrants, the *Rooker-Feldman* doctrine does not act as a bar to defendants wishing to assert constitutional claims based on state-issued warrants. Indeed, federal courts regularly undertake reviews of warrants issued by state magistrates without reference to or concern for this doctrine. *See, e.g.*, *Leon*, 468 U.S. at 905 (stating that "it undoubtedly is within our power to consider the question whether probable cause existed under the 'totality of the circumstances' test" to review a search warrant issued by a California State Superior Court Judge); *Quarles v. C.W. Weeks*, 815 F. App'x 735, 736-37 (4th Cir. 2020) (reviewing whether arrest warrant issued by state magistrate was not supported by probable cause and therefore a violation of plaintiff's Fourth Amendment rights); *Lyles*, 910 F.3d at 791 (reviewing whether the evidence supported a search warrant issued by a state magistrate judge). Based on this principle, the Court sees no reason why the *Rooker-Feldman* would

prevent it from reviewing the state magistrate's findings here in deciding whether the EPO and the eviction that it authorized constituted a violation of Plaintiff's Fourth Amendment rights.

This case also significantly differs from the case cited by the Marshall Defendants in support of their *Rooker-Feldman* arguments, *Bey ex rel. Graves-Bey v. Jacobs*. There, the plaintiffs challenged the entry of an *ex parte* child protective order entered against them by a state court judge, claiming that the entry of the order violated their constitutional rights. 2014 WL 3871348, at *1-2 (E.D. Va. Aug. 6, 2014). To the extent that the plaintiffs asked the court "to review and pass upon the merits of the protective order," the court declined to do so, citing the *Rooker-Feldman* doctrine. *Id.* at *8.

There, however, the case involved a child abuse preliminary protective order, entered pursuant to Va. Code § 16.1-253, an order that differs in critical ways from the one issued in the instant case. Child Protective Order, *Bey ex rel. Graves-Bey v. Jacobs*, 2014 WL 3871348 (E.D. Va. Aug. 6, 2014), ECF No. 1-2 ("*Graves-Bey* Protective Order"). For one, a magistrate cannot issue these orders, and a petitioner must appear before the court for a full hearing before he can receive one. Va. Code § 16.1-253(A). These orders also remain in effect for the length of time specified by the issuing judge, which in this case constituted six months, a much more permanent determination than the 72-hour order at issue here. *Id*; *Graves-Bey* Protective Order. Additionally, before ordering that the respondent leave the residence shared with the alleged victim, the statute requires that the petitioner prove by a preponderance of the evidence that the respondent's "probable future conduct would constitute a danger to the life or health of" the alleged victim, as opposed to the standard of reasonable or probable belief required by the EPO statute. Va. Code § 16.1-253(A)(6).

40

Finally, the preliminary protective order statute requires that notice of the protective

order hearing "be given at least 24 hours in advance of the hearing" to the child's guardian,

parents or to any other family or household member to whom the court might direct the order.

Va. Code § 16.1-253(C).  These individuals "shall be informed of their right to counsel . . . [and]

shall have the right to confront and cross-examine all adverse witnesses and evidence and to

present evidence on their own behalf." Va. Code § 16.1-253(D-E).  During the hearing, the court

also employs a preponderance standard in determining whether the petitioners have proved their

allegations of abuse or neglect.  Va. Code § 16.1-253(F).  While the court *may* issue such an

order *ex parte* if the alleged child victim "would be subjected to an imminent threat to life or

health," the court *must* provide an adversarial hearing to the affected parties within the shortest

practicable time after the order's issuance. Va. Code § 16.1-253(B).  Thus, the protective order

statute in *Graves-Bey* clearly provides more substantial due process protections and hallmarks of

a true judicial determination and "final judgment" than the process undertaken by the Henrico

magistrate in the instant case.  For these reasons, the Court finds that the *Rooker-Feldman*

doctrine does not bar Plaintiff from bringing constitutional claims that ask the Court to review or

pass judgment on the validity of the EPO.

### 2.   *Applicability of Res Judicata Principles*

For similar reasons, principles of res judicata do not bar Plaintiff's claims as the Marshall

Defendants claim.  As an initial matter, "[i]n considering the preclusive effect of an earlier state

court judgment on a new claim, [the Court must] apply the preclusion law of the State in which

judgment was rendered." *Bennett v. Garner*, 913 F.3d 436, 440 (4th Cir. 2019) (internal

quotations omitted).  Assuming for the moment that the issuance of the EPO represented a "state

court judgment," the Court must therefore apply the preclusion law of Virginia, because a

41

magistrate issued the order through the state court system.

In Virginia, the doctrine of res judicata includes both issue and claim preclusion. *Funny Guy, LLC v. Lecego, LLC*, 795 S.E.2d 887, 890 (Va. 2017) (citing *Lee v. Spoden*, 776 S.E.2d 798, 803-04 (Va. 2015)). "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Lee*, 776 S.E.2d at 803 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001) (internal quotations omitted)). Rule 1:6 of the Rules of the Supreme Court of Virginia represents the current governing law of claim preclusion in Virginia. *Id.* at 804. This rule states that:

> A party whose claim for relief arising from identified conduct, a transaction, or an occurrence, is decided on the merits by a final judgment, shall be forever barred from prosecuting any second or subsequent civil action against the same opposing party or parties on any claim or cause of action that arises from that same conduct, transaction or occurrence whether or not the legal theory or rights asserted in the second or subsequent action were raised in the prior lawsuit, and regardless of the legal elements or the evidence upon which any claims in the prior proceeding depended, or the particular remedies sought.

Va. Sup. Ct. R. 1:6(a). Thus, a party claiming claim preclusion must demonstrate: (1) the original claim was decided on the merits by a final judgment; (2) the same parties are present in both suits; and, (3) the suit is based on the same conduct, transaction or occurrence. *Id.*; *see also Lee*, 776 S.E.2d at 804-806 (detailing these elements).

Relatedly, issue preclusion precludes parties from relitigating issues of law or fact "actually litigated and essential to a valid final personal judgment in the first action." *Rawlings v. Lopez*, 591 S.E.2d 691, 691 (Va. 2004). The first court must have "'actually litigated and resolved [the issue] in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.'" *Lee*, 776 S.E.2d at 803 (quoting *Taylor v.*

42

*Sturgell*, 553 U.S. 880, 892 (2008) (internal quotations omitted)).  Thus, "[t]he party seeking to

assert issue preclusion must establish the following:

> (1) the parties [or their privies] to the two proceedings must be the same, (2) the
> issue of fact sought to be litigated must have been actually litigated in the prior
> proceeding, (3) the issue of fact must have been essential to the prior judgment,
> and (4) the prior proceeding must have resulted in a valid, final judgment against
> the party against whom the doctrine is sought to be applied.

*Lane v. Bayview Loan Servicing, LLC*, 831 S.E.2d 709, 714 (Va. 2019) (quoting *Glasco v.*

*Ballard*, 452 S.E.2d 854, 855 (Va. 1995)).  Whereas the *Rooker-Feldman* doctrine concerns a

federal district court's jurisdiction to hear a case, claim and issue preclusion constitute

affirmative defenses to a plaintiff's substantive claims.  Fed. R. Civ. P. 8(c).

The Marshall Defendants contend that these res judicata principles bar Plaintiff's claims

related to the EPO, because the issue of "whether there [were] sufficient factual grounds upon

which to issue the Family Abuse EPO" has already been decided.  (J. Marshall Mem. at 14.)

According to Defendants, the magistrate fully resolved this issue when deciding whether to issue

the EPO, and Plaintiff had a full and fair opportunity to challenge or appeal it.  (J. Marshall

Mem. at 14-15.)

However, Defendants' arguments fail for the same reasons that Defendants' *Rooker-*

*Feldman* arguments fail.  Specifically, as stated, the issuance of the EPO did not constitute a

final judgment.  A non-lawyer magistrate issued the EPO after a brief, *ex parte* hearing of which

Plaintiff had no notice.  Plaintiff had no opportunity to offer evidence in her defense before the

magistrate issued the EPO and Officer Holmes evicted her from her home.  Finally, the EPO

represented only a temporary determination, as it expired 72 hours after its issuance and ceased

to have any legal effect on the parties to it thereafter.  And a second magistrate declined to

reissue it.  Again, the Court finds the precedent set by cases involving constitutional challenges

to state-issued searches and arrest warrants persuasive in reaching its conclusion. *See supra* pp. 38. Principles of res judicata do not necessarily prevent a federal court from reviewing whether probable cause existed to support a search warrant even though a state magistrate already decided this issue.

Moreover, Plaintiff's contention that insufficient factual grounds existed to support the EPO represents but one example of her broader contention that Defendants' actions constituted a violation of her constitutional rights. Indeed, if the evidence later proves that Defendants wrongly secured power of attorney from Mr. Marshall, presented misleading information to the magistrate to secure the EPO or otherwise improperly executed the EPO in violation of its terms as Plaintiff suggests throughout her Complaint, the fact finder may determine that Defendants' actions were so unreasonable that they resulted in a violation of her constitutional rights without reviewing the magistrate's decision. For these reasons, the Marshall Defendants' res judicata claims fail.

### 3.    *Witness Immunity*

Robert Marshall also briefly contends that witness immunity bars Plaintiff's claims against him. (R. Marshall's Mem. at 15.) He points to the principle that witnesses testifying at trial or other pre-trial proceedings, including grand jury witnesses, enjoy absolute immunity from any § 1983 claim based on the witness' testimony. (R. Marshall's Mem. at 15 (citing *Rehberg v. Paulk*, 566 U.S. 356 (2012)).)

However, Robert Marshall does not fall within the protections of this principle, as he constitutes a "complaining" witness rather than a trial or pre-trial witness. A complaining witness represents an individual who "set[s] the wheels of government in motion by instigating a legal action." *Wyatt v. Cole*, 504 U.S. 158, 164-65 (1992); *see also Malley*, 475 U.S. at 340

(identifying a complaining witness as "one who procured the issuance of an arrest warrant by submitting a complaint"). At common law, a complaining witness cannot claim absolute immunity for bringing a complaint "maliciously and without probable cause." *Malley*, 475 U.S. at 340-41 (collecting cases establishing this principle). Thus, § 1983 may provide a remedy insofar as the defendant performed the function of a complaining witness. *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997); *Malley*, 475 U.S. at 341. Given that Robert Marshall, through his testimony and affidavit submitted to the magistrate, played a role in initiating or procuring the EPO, he constitutes a complaining witness and does not enjoy absolute immunity from suit.

### 4.    *Conspiracy Claims*

The Marshall Defendants also argue that Plaintiff's conspiracy claims fail, because Plaintiff has failed to allege more than conclusory allegations of a conspiracy with Officer Holmes, without any factual support. (J. Marshall's Mem. at 15.) Specifically, they contend that the Complaint remains devoid of allegations of a combination, agreement or understanding between any of the defendants, much less with Officer Holmes. (J. Marshall's Mem. at 16, 19.) Brenda Thompson also contends that the Complaint lacks any factual allegations that support the existence of an unconstitutional conspiracy between herself and Officer Holmes, or any of the other Marshall Defendants to support a common law conspiracy claim. (B. Thompson's Mem. at 8.) In fact, she notes, the Complaint only mentions Brenda Thompson in three paragraphs. (B. Thompson's Mem. at 8.)

### i.    **Conspiracy to Commit a § 1983 Violation**

As stated, to establish a claim under § 1983, a plaintiff must allege that the defendant "(1) deprived a plaintiff of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was performed under color of" state law. *Phillips*, 572 F.3d at 180. A

private party's joint participation with state officials in the deprivation of the constitutional right

proves sufficient to hold them liable under this statute. *Lugar v. Edmondson Oil Co.*, 457 U.S.

922, 937, 941 (1982). Importantly, the private actor must have "acted together with or [ ]

obtained significant aid from state officials." *Id.*

To establish a civil conspiracy under § 1983, a plaintiff must prove that the defendants

(1) "acted jointly in concert" and (2) performed some "overt act" (3) "in furtherance of the

conspiracy" that resulted in the deprivation of a constitutional right. *Hinkle*, 81 F.3d at 421.

While a plaintiff need not produce direct evidence of a meeting of the minds, the evidence must

reasonably lead to the inference that Defendants "positively or tacitly came to a mutual

understanding to try to accomplish a common and unlawful plan." *Id.* This requires that the

plaintiff identify "specific circumstantial evidence that each member of the alleged conspiracy

shared the same conspiratorial objective." *Id.* Conclusory allegations of a conspiracy will not

suffice. *Smalls*, 2015 WL 8335735, at *4.

Plaintiff alleges two § 1983 conspiracies: (1) conspiracy to cause unconstitutional

eviction and (2) conspiracy to unconstitutionally deprive of property. In ruling on Officer

Holmes' Motion to Dismiss, the Court has already concluded that Plaintiff has alleged facts

sufficient to establish a § 1983 violation as to both of these claims — Officer Homes evicted

Plaintiff from her home without a reasonable belief that this would further the purposes of the

protective order statute, and he delivered possession of Plaintiff's house key and home to

individuals without legal authorization to take possession.

Turning next to the elements of conspiracy, Plaintiff alleges several facts from which the

Court can infer that Defendants John, Robert and Andrea acted "jointly in concert" with Officer

Holmes to both secure the protective order that forms the basis of the unconstitutional eviction

claim and gain access to Plaintiff's home to seize her property. Plaintiff details the tumultuous

relationship that she and Mr. Marshall had with Mr. Marshall's children, especially John

Marshall, after their marriage. (Compl. ¶¶ 9-12.) The Marshall children appeared "deeply

upset" that their father divorced their mother and married Plaintiff. (Compl. ¶ 9.) In the years

that followed, the Marshall Defendants became increasingly alienated from their father after he

told them that he would not see them without Plaintiff present. (Compl. ¶ 10.) Plaintiff claims

that this caused all of the Marshall Defendants to develop "hostility and contempt" for their

stepmother and that, motivated by this hatred for Plaintiff, the Marshall Defendants "embarked

on a malicious campaign" to disrupt Plaintiff's life. (Compl. ¶ 2.)

　　　　In addition to this shared antipathy, Plaintiff alleges a series of actions taken by these

parties from which the Court can infer a mutual understanding among Andrea, Robert and John

to accomplish a common scheme that included evicting Plaintiff from her home in order to enter

it and seize property from it. First, Plaintiff alleges that Andrea encouraged Plaintiff to leave Mr.

Marshall's bedside in the hospital for the primary purpose of ensuring that her brothers could

secure power of attorney for Mr. Marshall in Plaintiff's absence. (Compl. ¶¶ 22-23.)

Immediately after Plaintiff's departure, the Marshall family lawyer arrived at Mr. Marshall's

bedside to prepare various legal documents assigning primary legal decision-making power to

Robert and John Marshall. (Compl. ¶ 24.) Both John and Robert then secured power of attorney

from their father while their father remained "enfeebled" in his hospital bed and "unable to write

properly." (Compl. ¶ 25.) In so doing, they attempted to guarantee that either of them would

have the legal authority to take possession of Plaintiff's home as his father's legal agent after

securing the EPO. (Compl. ¶¶ 40, 59-63.) The Complaint then alleges that Officer Holmes

"agreed" to help them secure the EPO. (Compl. ¶ 37.) While only Robert and Officer Holmes

appeared before the magistrate, Plaintiff claims that John Marshall was "one of the persons

supporting the proposed order," and that Robert Marshall and Officer Holmes traded on this fact

to secure the order.  (Compl. ¶ 42.)  Finally, both Robert and Andrea took possession of

Plaintiff's house key after the magistrate issued the EPO and each used it to enter Plaintiff's

home to take her personal property.  (Compl. ¶¶ 69-74.)  Robert, John and Andrea's collective

antipathy towards Plaintiff, combined with this series of specific acts performed by these parties

circumstantially establishes that they shared a conspiratorial objective and formed an agreement

to unconstitutionally evict Plaintiff from her home and take advantage of this eviction to

wrongfully seize her property.

 However, Plaintiff's allegations prove insufficient to establish a conspiracy claim against

Brenda Thompson.  While Plaintiff's claims that Brenda Thompson had the same hostility

towards Plaintiff and, therefore, motivation to evict her from her home, Plaintiff fails to allege

any facts that would suggest her agreement to take part in the common scheme with the other

Defendants.  In fact, the Complaint only mentions Brenda Thompson individually three times —

first, when Plaintiff  mentions the Marshall Defendants and states that they "were furious at the

remarriage of their father to Ms. Marshall, and treated her with hostility and contempt"; next,

when Plaintiff identifies Brenda Thompson as a party to this action; and finally, when Plaintiff

alleges that Brenda Thompson told Plaintiff that she was "not supposed to be" in Mr. Marshall's

room after the hospital had banned Plaintiff from Mr. Marshall's room.  (Compl. ¶¶ 2, 4, 31.)

The only specific act performed by Brenda — telling Plaintiff that she did not belong in Mr.

Marshall's hospital room — does not reasonably appear to relate to the other Defendants' efforts

to evict Plaintiff from her home or seize her property.  Moreover, according to the Complaint, it

was a nurse, and not Brenda Thompson, who actually ordered Plaintiff to leave her husband's

hospital room. (Compl. ¶ 31.) Therefore, the Court cannot reasonably infer that Brenda Thompson committed any acts in furtherance of either the unconstitutional eviction conspiracy or the conspiracy to unconstitutionally deprive Plaintiff of her property, or otherwise entered into a mutual agreement with the other Marshall Defendants.

For these reasons, the Court DENIES John Marshall, Robert Marshall and Andrea Voehringer's Motions to Dismiss as to Counts Three and Five, but GRANTS Brenda Thompson's Motion as to Counts Three and Five and DISMISSES WITHOUT PREJUDICE these claims against her.

### iii. Common Law Conspiracy to Deprive of Property

The Marshall Defendants make similar arguments as to Plaintiff's common law conspiracy claim, which alleges that Defendants conspired to wrongfully evict Plaintiff from her home and then, in her absence, convert items of personal property from her home. For the same reasons that Plaintiff's unconstitutional conspiracy claims survive, her common law conspiracy claim survives as well.

According to Virginia common law, "a civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose or to accomplish some purpose not itself criminal or unlawful by criminal or unlawful means." *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003) (citing *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 337 S.E.2d 744, 748 (Va. 1985)). A plaintiff's allegations must establish that the defendants "combined together to effect a 'preconceived plan and unity of design and purpose.'" *Id.* (quoting *Bull v. Logetronics, Inc.*, 323 F. Supp. 115, 131 (E.D. Va. 1971)). However, "'mere conclusory language' is insufficient to state a cause of action for civil conspiracy under Virginia law." *Lewis v. Gupta*, 54 F. Supp. 2d

611, 618 (E.D. Va. 1999) (citing *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 802 (Va. 1985)). Thus, common law conspiracies are reviewed using an analysis similar to unconstitutional conspiracy claims.

As stated, Plaintiff has alleged facts sufficient to establish that John, Robert and Andrea conspired to remove Plaintiff from her home, so that they could seize property belonging to both her and Mr. Marshall. Specifically, Robert and John Marshall secured power of attorney for their father, so that they could enter Mr. Marshall's home after the magistrate issued the EPO. Robert Marshall appeared before the magistrate seeking the EPO and asked that Plaintiff be removed from her home. Additionally, according to Plaintiff's allegations, both Robert Marshall and Andrea Voehringer entered Plaintiff's home and took certain items from the home belonging to both her and Mr. Marshall. From these facts, the Court can reasonably infer that John, Robert and Marshall entered into an agreement to seek a protective order to gain access to Plaintiff's home and convert certain items of Plaintiff's personal property contained therein for their own use. However, the Complaint contains no mention of Brenda Thompson's role in this common law conspiracy that would allow the Court to infer that she participated in it, so this claim against her also fails.

For the foregoing reasons, the Court DENIES John Marshall, Robert Marshall and Andrea Voehringer's Motions to Dismiss as to Count Seven of Plaintiff's Complaint, but GRANTS Brenda Thompson's Motion as to Count Seven and DISMISSES WITHOUT PREJUDICE this claim against her. Because no claims remain against Defendant Brenda Thompson, the Court dismisses her from this action.

50

### 5.    *Common Law Conversion Claim*

Finally, the Court addresses Robert Marshall and Andrea Voehringer's arguments as to Plaintiff's common law conversion claim against them.  A common law tort of conversion in Virginia constitutes "the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *Economopoulos v. Kolaitis*, 528 S.E.2d 714, 719 (Va. 2000) (citing *Universal C.I.T. Credit Corp. v. Kaplan*, 92 S.E.2d 359, 365 (Va. 1956)).  Plaintiff's Complaint alleges that both Robert and Andrea took items from Plaintiff's and Mr. Marshall's home and never returned them. (Compl. ¶¶ 65-74.)  While both Robert and Andrea argue that they could not have converted any property because they were Mr. Marshall's legal agents and therefore acted as Mr. Marshall when they seized property from the home, Plaintiff identifies specific items of personal property that did not belong to Mr. Marshall, including several personal items that belonged to her late first husband, as well as a television purchased by Plaintiff.  (Compl. ¶ 74.)  Thus, even assuming that Robert's and Andrea's agency theory proves valid, Plaintiff has adequately alleged a common law claim of conversion against both Robert and Andrea.

Robert Marshall argues that the Court should presume that all of the property in the jointly owned residence constituted marital property pursuant to Virginia's property laws and, therefore, any of the items seized by him were owned by both Plaintiff and Mr. Marshall jointly. (R. Marshall's Mem. at 22 (citing Va. Code § 20-107.3).)  Under Virginia's marital property statute, marital property constitutes (1) property titled in both spouses' names, (2) a part of any property classified as marital pursuant to the statute, and, (3) any property acquired during the marriage which does not constitute separate property as defined under the statute.  Va. Code § 20-107.3(A)(2).

However, Robert Marshall's argument that this statute precludes Plaintiff's conversion claim fails for several reasons. First, for the purposes of resolving these Motions, the Court will accept as true the facts as alleged by Plaintiff and view these facts in a light most favorable to her. Plaintiff repeatedly states that the property seized by Robert and Andrea belonged to her, so the Court will presume that it does not fall under one of the definitions of marital property as defined by the statute. (Compl. ¶¶ 74, 95.) Second, even assuming that the Court could consider facts outside the Complaint, Robert neglects to offer an explanation as to how personal items of Plaintiff's late first husband, including his certificate of naturalization and blazer, could constitute marital property belonging to both her and Mr. Marshall. Under the same statute cited by Robert, any property acquired before the marriage and "all property acquired during the marriage by bequest, devise, descent, survivorship or gift from a source other than the other party" constitutes separate property. Va. Code § 20-107.3(A)(1). It appears reasonable to infer that Plaintiff acquired the personal effects of her late first husband in one of these two ways, rendering them separate property, owned exclusively by her.

As a final point, Andrea Voehringer cannot claim that she acted as Mr. Marshall's agent when she retrieved items from Plaintiff's home, given that the power of attorney executed while Mr. Marshall remained hospitalized granted power of attorney to John and Robert Marshall alone. (Compl. ¶ 24.) Nowhere does Plaintiff allege or even suggest that Andrea Voehringer had legal authority to act on Mr. Marshall's behalf. Thus, unless Andrea can later establish some legal right to the converted property, Andrea cannot invoke the protections offered by this agency defense.

For these reasons, Plaintiff has adequately alleged a common law claim of conversion against both Robert Marshall and Andrea Voehringer. Thus, the Court hereby DENIES Robert

52

Marshall's and Andrea Voehringer's Motions to Dismiss as to Count Six of Plaintiff's Complaint.

### IV.   CONCLUSION

The Complaint in this case alleges a shocking abuse of the state judicial system to remove a 57-year-old woman from her home, while her enfeebled husband lay incapacitated in his death bed in the hospital.  That this occurred in a jurisdiction where one of the Defendants serves as a Circuit Court judge renders it even more disturbing.  Of course, the Complaint tells only one side of the story, and the Defendants will have the opportunity to present their side at trial.  But based on the facts set forth in the Complaint, the Court at this stage has no qualms in denying the Motions of all of the Defendants, except Brenda's.

For the reasons set forth above, the Court DENIES Officer Holmes' Motion to Dismiss (ECF No. 27), John Marshall's Motion to Dismiss (ECF No. 34), Robert Marshall's Motion to Dismiss (ECF No. 36) and Andrea Marshall Voehringer's Motion to Dismiss (ECF No. 32). However, the Court GRANTS Brenda Marshall Thompson's Motion to Dismiss (ECF No. 30) and DISMISSES WITHOUT PREJUDICE all claims against her.

An appropriate order will issue.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: March 1, 2021